J. W. LUTTES ET AL v. THE STATE OF TEXAS.

No. A-5858. Decided June 18, 1958.
Rehearings overruled December 10, 1958.
Second motion for rehearing overruled May 6, 1959.
(324 S.W. 2d Series 167)

*Davenport & Ransome* and *Harbert Davenport*, of Browns-ville, for J. W. Luttes, *R. H. Whilden, W. G. Winters, Jr., C. R. Nadeau*, all of Houston, and *Dan Moody*, of Austin, for Shell Oil Company.

The Court of Civil Appeals erred in holding that the shore of the Potrero de Buena Vista Grant in the Laguna Madre is the line reached by the year's highest waves caused by the wind and in failing and refusing to hold that the shore of such grant is the line of mean high tide; also in failing and refusing to hold that there is no evidence to support the finding by the trial court that the lands in controversy are not fast lands; and in failing and refusing to hold that there is no evidence to support the finding by the trial court that it is not possible to apportion the accretions between the mainland and the islands. State v. Balli, 144 Texas 195, 195 S.W. 2d 71; Motl v. Boyd, 116 Texas 82, 286 S.W. 458; Port Terminal Railroad Ass'n. v. Ross, 155 Texas 447, 289 S.W. 2d 220; Renfro Drug Co. v. Lewis, 149 Texas 507, 235 S.W. 2d 609.

*John Ben Sheppard*, Attorney General and *J. Arthur Sandlin*, Assistant Attorney General, for respondent.

MR. JUSTICE GARWOOD delivered the opinion of the Court.

The ultimate issue in this dispute between the State of Texas (defendant below, by consent, and respondent here) and the plaintiffs, Luttes et al. (our petitioners) is the title to some 3400 acres of mud flats or former sea bottom in Cameron County lying along, and alleged to be accretions to, the mainland or westerly edge of the long narrow lagoon known as Laguna Madre, about fifteen or twenty miles north of Port Isabel and the mouth of the Rio Grande River, and about fifteen miles south of Port Mansfield on the Laguna. The Laguna, of course, lies between the mainland on the west, and on the east, the long, narrow, sandy island called Padre, the eastwardly side of which latter is the shore of the Gulf of Mexico.

The flats abut to the west upon a line of the upland or main-land characterized by a steep angle of elevation, although the altitude of the land along this line is hardly enough to justify

the name "bluff line" which the parties call it. This line was the original easterly boundary of the now admittedly valid 1829 grant of land on the mainland from the Mexican State of Tamaulips to Manuel de la Garza Sosa, to whose rights the petitioners-plaintiff have succeeded. The grant, known as Potrero de Buena Vista, stipulated as its easterly or seaward boundary the westerly "shore" of the Laguna.

In a trial to the court and upon elaborate fact findings by the trial judge, judgment went for the State and was affirmed by the Waco Court of Civil Appeals upon transfer. 289 S.W. 2d 357.

The property claim of the State in the premises is, of course, that of successor (since 1836) to the Mexican nation or state, which latter, prior to the grant, admittedly owned the bottoms and shores of public waters such as the Laguna, as well as the upland granted. At the date of the grant, and, indeed, for well over half a century thereafter, the area in suit was always covered by the waters of the Laguna and thus admittedly did not pass to the grantee at the time of the grant nor thereafter, unless at some time about the first quarter of the present century. Accordingly, had this suit occurred some half century sooner than it did, the result would admittedly have favored the State.

However, since some obscure date in the past, the area has been progressively rising in relation to the Laguna waters, with the result that it is now from 0.25 feet to 1 foot above mean sea level, in greater part above the line of "mean high tide" (as hereinafter explained) and covered by the waters, not as a regular daily, weekly or even monthly matter, but only at irregular intervals and in irregular amounts, although, from the rather meager records in this behalf, it cannot be said that the presence of sea water in substantial quantity is rare.

The petitioners-plaintiff say that under the evidence and applicable principles of law, the land has become, since some forty years ago, a part of the upland as distinguished from sea bottom or seashore and, having become such by a *genuine* process of accretion to the earlier upland, the title to it has accordingly passed from the State to them as upland owners. On the other hand, the respondent-defendant State contends: first, that, although the area in dispute may have long since ceased to be mere sea bottom, it is neverthless, not upland or fast land, but seashore, as the latter term is defined by the Mexican (Spanish) law, which was admittedly in force at the date of the grant and

thus controls thereafter the effect of the grant; that accordingly the area still belongs to the State, as admittedly it does if it is properly seashore. In the same connection, the State asserts that by the governing Mexican (Spanish) law, the landward or upper line of the "shore" is not the line of "mean high tide," [or "mean high water;" see "Tide and Current Glossary," Special Publication No. 228; Revised (1949) Ed., U. S. Dept. of Com., Coast & Geodetic Survey, p. 23,"] which applies only in respect of grants made by Texas after she adopted the common law in 1840, but a higher or more landward line. We are not certain as to the State's view or just what this line is in terms of practical determination, but the contention seems to be that it is either the highest — most landward-line reached by the waters on any one occasion that can be proved or perhaps the average of single highest annual lines for such years as to which proof is available. Storm high waters are admittedly not to be taken into consideration.

Alternatively, but no less importantly, the State contends: that, even conceding the area in question to be now upland or fast land, as distinguished from "shore," the petitioners-plaintiff had the heavy burden (as they clearly did) which they have failed to discharge to the proper satisfaction of the trial court, of establishing factually, (a) that the status of the area as fast land is due to *genuine* accretion, that is, the gradual forces of nature herself as distinguished from human factors, and (b), that any such genuine accretion was accretion *to their abutting upland* rather than to certain islands or other admittedly state-owned areas to seaward of the original seaward boundary of the grant.[1]

Relevant to the foregoing contentions are the following facts, which, except as otherwise stated, may be taken as true: the 3400-acre disputed area is the bulk of a somewhat larger area of about 4000 acres, which is roughly in the form of a triangle, with its base (some three or more miles long north and south) being the original easterly boundary of the grant and, for well over a half century thereafter, the westerly line of the Laguna waters, while the other two sides (some two and a half or three miles each) run out respectively southeast and northeast from the base line to coverage or terminate respectively at the north-

---

1.—"The area in controversy was formerly the bed of the sea. The burden on the applicants" [abutting owners] "was two-fold; first, to prove that the sea had abandoned this area; second, to prove that appellants had acquired it by accretion or reliction." Holmes, J., in Humble Oil & Refining Co. v. Sun Oil Co., 191 Fed. 2d 705, 716.

See also our own opinion in Giles v. Basore, 154 Texas 366, 278 S.W. 2d 830.

erly and southerly ends of a fairly narrow island, or former island, over a half mile long, called "North Three Islands." Along the northerly line of the triangle and something over two miles northwest of North Three Islands lies a similar "island" called Yucca, although the latter runs more in an east-to-west direction than the former, and all of it lies within the triangle.

About a half mile northwardly of Yucca lies another "island" called Heron, which is partly within the triangle, while northwardly of Heron and outside the triangle lie several others. More or less paralleling these later islands to the northwest and outside of the triangle is a peninsula-type area called Horse Island over two miles long, rather narrow and jutting out northeasterly from a point near the north end of the mentioned base line.

All of the so-called islands above mentioned are elevated well above the flats and were admittedly true islands until at least sometime between 1920 and 1930, title to Heron, Yucca and North Three Islands being thus admittedly in the State. The petitioners-plaintiff concede also that of the total 4000-acre area of the triangle, some six hundred acres adjacent to the respective named islands represent accretions accruing to the islands, as distinguished from accruals to the mainland, and thus also belong to the State.

Immediately outside the converging sides of the triangle, that is, to the northeast, east and southeast thereof, and beyond the mentioned islands, lie what are admittedly the open waters of the laguna, through which the Intracoastal Canal, a well-used ship channel about twelve feet deep and with a sometimes quite strong current, runs in a northwesterly-southeasterly line flanking the triangle to the eastward and passing it within less than a half mile at the closest point just eastwardly of the apex, which is North Three Islands. The Canal was constructed by dredging sometime between 1940 and 1949. As a result of the dredging, a quite large number of spoil banks were left projecting well above the waters on the westerly side of the canal, between it and the entire area in suit, which tend to obstruct the free passage of water from the Laguna toward that area.

At the north of the area in suit, the southwesterly end of the Horse Island peninsula aforementioned was, as late as about 1915, separated from the mainland by a narrow channel running southwardly through or into the area in controversy and thus cutting off much of its northern portion from the then easterly boundary of the grant. North of Horse Island lies a quite large low area known as the National Wild Life Refuge, which is some-

times covered with the Laguna waters, and still further north lies the Harlingen Ship Channel (another more or less artificial canal) running in a straight line eastwardly from the mainland and from a stream called the Arroyo Colorado to join up with the Intercoastal Canal, more or less at right angles, and at a point several miles northwardly of the area in controversy. Formerly water from the region north of the latter area used to pass between the mainland and the southwesterly end of Horse Island; but at some time between 1924 and 1934 a bridge over the gap was replaced by an earthern fill or dam, and thereafter no water has passed through. The Harlingen Ship Channel was constructed at some time between 1940 and 1949, and the dredging of it, like that of the Intercoastal Canal, has left substantial spoil banks alongside it which have since to some degree interfered with the free movement of waters north and south.

The surface of the area in question, including the disputed 3400 acres, has the characteristics of a basin, or, more accurately, a series of small basins running roughly from a point half a mile or so off the northerly portion of the base line of the triangle in a southeasterly direction across the middle of it. The lower levels of these basins are between 0.25 and 0.40 feet above mean sea level (slightly below "mean high tide") and cover a substantial part of the acreage claimed by the petitioners-plaintiff; but the bulk of the latter and of the whole 4000-acre triangle lies above the 0.40 foot contour, rising generally toward the sides, along which, including the mainland side, it is largely between 0.80 feet and 1 foot above mean sea level, or about 0.50 above the level of "mean high tide."

Except on the "islands" themselves, as distinguished from the flats, there is no vegetation except algae, which does not have the appearance of normal vegetation and forms a sort of thin darkish mat over the surface, drying up and cracking in the frequent periods when the flats are free of water. (This algae is said by the principal witness for the petitioners-plaintiffs, a geologist named Dr. Lohse, to be a fresh water type of vegetation and by the botanist testifying for the State to be definitely a salt water type.) The soil of the flats is evidently of a darker and muddier appearance and character than the sand which comprises the flats and beaches of Padre Island several miles across the Laguna to the eastward. At least when the area is free of water, fairly heavy motor vehicles can be driven over most of it without difficulty. At the same time, and apart from the matter of the algae, it has many characteristics of land that is

periodically covered by sea water, including a perennial dampness, presence of numerous salt crystals, sea shells, remnants of fish and so on, while water can evidently always be reached by digging a foot or two below the surface.

Where the flats join the mainland and the islands there is an abrupt change in the angle of elevation and the character and appearance of the soil, including a well marked beginning line of sand, followed by grass and vegetation. This line, so far as it lies along the established mainland, is consistently referred to by the petitioners-plaintiffs themselves as a "bluff" or "bluff line," and evidently is considered by them to have been the undoubted seaward limit of the Buena Vista grant at least up until the early part of the present century.

Much of the mainland lying immediately westward of the flats appears to be itself a sort of large peninsula some three or more miles wide from east to west and several times that in length from north to south, being flanked on the west by a narrow stream or natural canal called "Cayo (or Callo) Atascoso," which appears to be a prolongation of a former stream bed called Resaca de los Fresnos (literally translated, "Old Stream Bed of the Ash Trees") and runs in a more or less northerly direction to merge with the Harlingen Ship Canal at a point about two miles westward of its juncture with the intracoastal canal. Several miles westward and northwestward of the Resaca de los Fresnos and Cayo Atascoso runs a stream or natural canal called "Arroyo Colorado" in the same general direction, merging with the Laguna six or seven miles north of the Harlingen Ship Channel. The two named streams or stream beds stem from points at or near the Rio Grande and considerably to the west and southwest of the area in suit, but are separated from the Rio Grande by flood control works and have been since about 1933.

Very conspicuous in the testimony from the standpoint of the petitioners-plaintiff is another "resaca" known as Resaca de los Cuates (literally, "Old Stream Bed of the Twins"). It, too, originates at or near the Rio Grande some fifteen or twenty miles to the southwest of the area in controversy, meandering tortuously over the mainland in a northeasterly direction between the Resaca de los Fresnos on the north and northwest and the area in controversy on the south and southeast. At the present time, what the witness, Dr. Lohse, for the petitioners-plaintiff, described as the "mouth" of the resaca, lies at a point in the southerly half of the base or westerly ("bluff") line of the

area in suit. Like the other mentioned streams or old stream beds, the Resaca de los Cuates is separated from the Rio Grande by flood control works since 1933. While from time to time of recent years it evidently does contain water from rains, the proof in this behalf is rather vague, and undoubtedly the resaca has lacked the characteristics of a stream for many years past. According to the expert opinion of Dr. Lohse, this resaca was in ancient times a primary channel of the Rio Grande, of which main river the wide area from a point far north of the property in suit to a point near the present mouth of the Rio Grande, was a delta, being built up as such with silt gathered by the Rio Grande from its long course on the mainland, then eroded away by invading sea water and wind and then built up again.

While this geological story of the delta goes back several thousand years, and it would seem to be true that the mainland behind the flats in suit, as well as the flats themselves, are thus primarily formed of deposits originating with the mainland rather than with the bottom of the sea, the petitioners-plaintiff themselves yet admit, as before stated, that at the time of the Buena Vista grant and into the early part of the present century, the seaward limit of the Buena Vista grant was in fact the present westerly (bluff) line of the area in suit, while as late as between 1920 and 1930, the Laguna waters still regularly separated the islands from the mainland. Indeed, certain federal government maps and charts in evidence show substantially all the area in suit as water in 1923 and even later. Moreover, whatever the importance of the Resaca de los Cuates in ancient times, its relevance to the modern times, in which the accretion of the disputed area to the mainland is alleged to have occurred, is somewhat obscure. As indicated, the proof as to the amount and permanency or impermanency of water in the resaca and its discharge onto the area in question is meager, and some of the exhibits seem to indicate that, at least as a general rule, it was dry about the time when most of the accretion is said by the petitioners-plaintiff to have accrued.

The proof as to what part of the alleged accretions evolved from the mainland (bluff line) out, as distinguished from that evolving from the islands or other offshore points, consisted largely of the expert opinion of Dr. Lohse above mentioned based on cores of a few feet length taken from the area in suit and said by him to represent, so far as presently available, the geological history of the area from a period several thousand years back, although an extraordinarily large part of the length of each such core was said to correspond to deposits made during

the last thirty or forty years. The cores are not readily intelligible to the lay observer.

In alleged accordance with these deductions, Dr. Lohse fixed several straight lines to the east, southeast and south of Yucca Island and one straight northwest-southeast line across the narrower portion of the flats about a half mile eastward of North Three Islands, concluding the area between such lines and the respective "islands" to represent that portion of the total alleged accretions (the entire triangle in question) which constitutes accretions accruing to the islands. It is to be noted that all of these lines lie considerably to the eastward or seaward side of the heretofore mentioned line of basin bottoms of the flats and are thus on a considerably higher level than the low central areas, which latter, and much of the higher area on the island side thereof, Dr. Lohse allocated to accretions built from the mainland out.

The proof tending to show the accretions to be the very gradual and purely natural process required in order to transfer title was also largely a matter of Dr. Lohse's expert deductions from the cores and his own reconstruction of ancient and modern geological events.

Dr. Lohse is an employee of one of the petitioners-plaintiff since some years back and made his more recent and elaborate studies of the area in question for the purpose of later being able to testify for the respondents in this suit.

Going back to the matter of sea water levels, there has never been any permanent measuring device ("tide gauge") at the particular area, the two nearest ones being each some 15 miles away in opposite directions, to wit, the tide gauge of the United States government operated at Port Isabel since April, 1954 and a similar apparatus at Port Mansfield operated by the Humble Oil & Refining Company since June, 1947. These gauges reflect the changes in the water levels at all times, regardless of the cause of the change, and in such manner that the levels so determined with reference to mean sea level can be, as they were, accurately correlated with the corresponding levels of the flats in controversy.

Properly speaking the term "tide" means the regular and predictable perpendicular daily rise (or rises) and fall (or falls) of the waters as a result of astronomical forces, to wit, the gravitational pull of the sun and moon (mostly the latter) upon the

earth. See Tide and Current Glossary, supra. The levels reached by tides vary from day to day and as between all other fixed periods of time, however long, and also as between different geographical areas. But water levels are also influenced by weather conditions, such as wind, temperature and atmospheric pressures, as well as by other factors not connected with astronomical forces and, of course, by combinations of all or part of the former. Thus water level changes, whether produced by astronomical or nonastronomical forces or by combination between the former and the latter are reflected by the tide gauges, which record the different levels attained, although they do not, as to any given level or reading, purport to record the cause as astronomical, nonastronomical or both.

As found by the trial court, and admitted by the parties to the suit, there is in the Laguna Madre relatively little tide in the true sense, although there are undoubtedly substantial and frequent, but irregular, variations in water levels during each day or longer period due to the influence of nonastronomical forces and conditions, sometimes in combination with astronomical tide conditions in the Gulf of Mexico. One of the factors causing, or substantially contributing to, higher water levels in the general area in suit is the presence of northerly winds in the period from early Fall to Spring, although, on the other hand, there have been recent instances of sea water overrunning the flats in midsummer. There is also present, and due in at least some part to astronomical forces, a progressive, slow rise over the years of the general ("mean") sea level at an average rate of about 0.02 feet per year.

Thus, while on any one day we have the single variation between a highest level to a lowest, we have also the variation from what was the highest (or lowest) on that day and what is the highest (or lowest) on the next day. Similarly if we take the highest (or lowest) single instance that occurred in an entire year, it will ordinarily be different from a corresponding instance of the next or preceding year. And, of course, when we speak in general terms of the "highest water" *for* a given period longer than two days, we may mean that highest level of a particular day which is also higher than that reached on any other day of the period, or we may mean, perhaps, the sum of all the daily highs of the period (e. g., 365 in number for a year) divided by the number of days of the period (e. g. 365 in number for a year). If we mean the latter, such an average figure will necessarily be lower than the one highest annual level above mentioned. Moreover, the average figure, while it will vary from

a similar average figure for a comparable period before or after that in question, will vary less than the single high of one such period varies from another, averages being always lower than a single highest as well as higher than a single lowest.

In the instant case, the trial court, either as a primary or secondary basis of his conclusion that the area in dispute was still "shore," under the Mexican (Spanish) law, took the one highest reading of the Humble gauge at Port Mansfield for each of the four years of gauge operation, added these four individual footage readings and divided the total by four, the result being a footage of 2.24 feet above mean sea level, or more than high enough to inundate the area in dispute. A similar result (2.64 feet) followed his similar calculation based on the ten-year Port Isabel gauge. [On account of the reference to the supposedly higher tides or waters *of winter* occurring in some statements as to the Mexican (Spanish) law of the seashore, it is interesting to note at this point that similar readings, and similar calculations therefrom by the trial judge, but using only the one highest reading during the *winter* of each year, produced substantially lower figures (1.56 feet, Humble, and 2.03 feet, Port Isabel) than those first above mentioned, although still high enough to inundate the flats].

On the other hand, if the court had based his averages, not on the single highest reading of each year, i.e., one reading per year, but on day by day highest readings, i. e., 365 of them for one year, 1460 for four years, 3650 for ten years—adding them all together and dividing by the corresponding number of days, the resultant levels would have been much lower than those above mentioned upon which he actually relied and would have been, by and large, lower than the level of the flats. This is demonstrated by the court's own and uncontested findings to the effect that "mean high tide" or "mean high water" at the Humble gauge was only 0.416 feet above mean sea level and at the Port Isabel gauge only 0.56 feet, these levels being somewhat lower than the levels prevailing over most of the disputed area, especially at the perimeter thereof.

The terms last mentioned, as employed by the court and as universally understood, mean an average of all the daily highest readings over a long period. The proper period is one of approximately 19 years, since within such a period the astronomic forces affecting the water level go through a complete cycle. In localities in which tide gauge readings for so long a period are not available the accepted practice for determining "mean high

tide" or "mean high water" is to take the daily local tide gauge readings for such periods as they are available, provided it is not less than one year, and correct them by comparison with the nearest gauge which affords a record for 19 years, the corrected result being a substantially accurate approximation of true mean high tide at the locality in question over the 19-year cycle. See Tidal Datum Planes, U.S. Dept. of Com., Coast and Geod. Survey, Special Publication No. 135, Rev. Ed. (1951) p. 86 et seq.; Borax Consolidated v. City of Los Angeles, 296 U.S. 10.

Thus the difference between this "mean high tide," found by the court to be but about half a foot above mean sea level, and the much higher figure of about two and a half feet upon which he relied and which he found to represent the "highest" water levels (excluding storm conditions) is but a difference between the number of different highest water readings taken and averaged out in each instance. This difference of method, although both methods involve to lesser or greater degree an average or mean of highest levels, was undoubtedly intended by the court to reflect his view of the difference between the Anglo-American law concept of "shore" (as the area below the line of "mean high tide," "mean high water" or "ordinary high tide") and the alleged Mexican (Spanish) law concept (as, generally speaking, the area below the "highest" reach of the waters, limited only to the extent that such level be not due to storm type conditions).

As above indicated, and as more fully reflected in the opinion of the Court of Civil Appeals (289 S.W. 2d 357 et seq.), the trial court made elaborate findings of fact, including amendments following his review of his original findings at the behest of the petitioners-plaintiff. These findings and his corresponding conclusions of law largely favored the contentions of the respondent-defendant State as heretofore outlined.

As to whether the area in dispute is or is not "shore," as distinguished from upland or fast land, there was evidence introduced by both sides, including some expert testimony. However, the petitioners-plaintiff are, in our opinion, correct in saying that this particular question, as now presented to us, is really a question or questions of law, to wit: (a) Was it error for the courts below to apply the Mexican (Spanish) law, as distinguished from the common law, and (b) if not, was the Mexican (Spanish) law yet correctly interpreted and applied with regard to the instant situation? If the views of the courts below on (a) and (b) are correct, the judgment below must be af-

firmed, regardless of the questions concerning accretion, because such fact findings as are relevant to the "shore" phase of the case are admittedly not without support in the evidence. Such findings, of course, include some that, on this aspect of the case, are conceivably the basis of ultimate rulings in favor of the petitioners-plaintiff, such as the mentioned findings that "mean high tide (or water)" as determined by the two mentioned tide gauges is lower than the level of the bulk of the area in controversy.

The other and independent grounds of the decision below, in so far as questioned here, are factual in nature, the only attacks on them by the petitioners-plaintiff being that they are entirely without support in the evidence, and, in any event, against the great weight and preponderance of the evidence, the Court of Civil Appeals having failed to pass on the matter of weight and preponderance in disregard of the rule restated in In re King's Estate, 150 Texas 662, 244 S.W. 2d 660. These findings are to the effect that the evidence for the petitioners-plaintiff fails to sustain their burden of satisfying the court that (a) assuming the status as fast land of all or part of the metes and bounds area claimed by them to have been the result of genuine accretions, they were accretions to the land granted as distinguished from accretions to the above-named islands or other state owned lands and that (b) the alleged accretions were genuine or "legal" accretions in the sense of a purely natural and imperceptible increase or elevation of the land, as distinguished from deposits partly due to human activity such as closing the channel or depression between the mainland and the southwesterly end of Horse Island and the creation of the spoil banks along the Intracoastal Canal and Harlingen Ship Channel, which operated to shut in the area in question and impede the access and movement of the Laguna waters with regard thereto.

We granted the writ of error largely in the hope of being able to eliminate the confusion that appears to exist at the Bar and otherwise as to what, in details of practical application to cases like the present, is the correct definition of the shore—the matter being obviously one of considerable public importance. We shall accordingly discuss that question first.

■ We harbor no doubt that the Mexican (Spanish) law, whatever it may be, in effect at the date of the grant, is what must furnish the applicable rule, and that such is the effect of every decision, observation or assumption that has ever been made by

this Court on the subject, including those of as recent date as Rudder v. Ponder, 156 Texas 185, 293 S.W. 2d 736, Giles v. Basore, 154 Texas, 366, 278 S.W. 2d 830, and State v. Balli, 144 Texas 195, 190 S.W. 2d 71. We consider Humble Oil & Refining Co. v. Sun Oil Co. (5 Cir.) 190 Fed. 2d 191, 191 Fed. 2d 705, cert. den., 342 U.S. 920, as being to the same effect. Any confusion that may exist by reason of a previously somewhat unstudied use of the broad term "civil" law in texts and decisions, as distinguished from the applicable Mexican (Spanish) law, is confusion only as to what effect is to be given to the Roman law of Justinian's time in interpreting the vague terms of the Mexican (Spanish) law of several centuries later for application to the very practical question of fixing a line on the ground today.

Without prejudice to our final view as to what the applicable Mexican (Spanish) law actually provides, and how it should be here applied, we are satisfied that State v. Balli, supra, is not, and does not purport to be, controlling. What State v. Balli decided in this general connection was simply that *under the evidence presented in the particular case* (incidentally, quite meager evidence on the point) a particular line actually drawn on the ground by the State's own surveyor, Mr. Stewart Boyles, which he testified to be the line of "mean high tide," and which the State itself as plaintiff contended for in effect by claiming Padre Island under the Boyles survey of the island, with his line of "mean high tide" as the outer boundary thereof, was not necessarily different on the ground from what would be the then alleged Mexican (Spanish) law line of "highest winter tide." Actually no survey was ever made of any such latter line, and, as stated, the State had sued for title to Padre Island as bounded by the "mean high tide" line drawn by Mr. Boyles on the ground.

The trial court in the Balli case rendered judgment for the defendants, in effect awarding them the survey for which the State had sued. The State then made the point that of the many thousands of acres involved in the suit, it had been erroneously deprived of at least a relatively small fraction (some 5000 acres) by the action of the court in accepting Mr. Boyles' line rather than the allegedly higher line of the Mexican (Spanish) law. Both the Court of Civil Appeals and this Supreme Court held in so many words that the trial court had impliedly found as a fact that there was no substantial difference between Mr. Broyles' line on the ground and the theoretical line said to be that of the Mexican (Spanish) law, and that the evidence in the case was such as to support that finding. See the very clear language of

this Court in 144 Texas at page 252, 190 S.W. 2d at page 101, and that of the Court of Civil Appeals in 173 S.W. 2d at pages 543-544.

This ruling was in direct response to a corresponding contention of the successful defendants in the case; and the nature of the ruling was not changed by the fact of the State contending in the appellate courts that the trial court had abandoned the applicable Mexican (Spanish) rule or by the fact of the defendants making, as they did, an alternative appellate argument that the rules of the Mexican (Spanish) law and of the Anglo-American law were, as a matter of legal principles, actually the same. While the strong inference from the Supreme Court opinion is that the Mexican (Spanish) law governed, actually both that Court and the Court of Civil Appeals bypassed the narrower question now presented of whether the two legal rules were essentially the same, whatever their formal terms. Had it been otherwise, both courts would necessarily have discussed the matter in far greater detail than they did both on principle and in the light of the language of various well-known Texas decisions of earlier date commenting on that very subject.

All this is not to deny, however, that since State v. Balli, and as a result thereof, a particular line, actually marked on the Laguna side of Padre Island, and which may actually be the line of mean high tide, is now the boundary of a large portion of the total shores of the Laguna, that is, of the portion of such shores that was involved in the Balli case. Accordingly, should a line different from that of mean high tide be the result of the instant case, conceivably, although not certainly, different kinds of boundaries will, as a matter of fact, prevail on the different sides of the Laguna.

There is, indeed, much to be said on principle for the thesis of substantial identity between the two rules in question in the light of modern conditions. The Mexican (Spanish) law provision, infra, with which we are mostly concerned, being written in the middle ages under circumstances vastly and variedly different from those under which we must now give it an exact application, a court can have no vast confidence in its own deductions, however "educated," as to the intent of the ancient Spanish law writers derivable from their few and quite general words, somewhat different in form from present day Spanish and conceivably different in meaning to their authors from what their formal modern counterpart would mean even to modern

Spanish jurists. Nor can we rely with great confidence upon translations and interpretations made centuries later—often by non-Spaniards, whose expertness in the language and subject matter must largely be assumed from the fact that they presumed to write a tract or book about it or, being judges, had to write a judicial decision based on such relatively meagre knowledge as is, and has been, available. The inadequacy of all language, however wise and learned the source, is notorious when it comes to be applied to particular facts and conditions of a later and quite different age, which doubtless were not clearly contemplated by the authors.

The basic definition, of course, is that of the celebrated body of Spanish law known as *Las Siete Partidas*, which was evidently written in the 13th century and promulgated some three centuries later, and of which the critical portion of Partida 3, Title 28, Law 4 (from the so-called Lopez edition published at that time under governmental auspices at Salamanca) reads as follows:

"* * * e todo aquel lugar es llamado ribera de la mar quanto se cubre el agua della, quanto mas crece en toda el año, quier en tiempo del invierno o del verano."

A rather literal translation of this ancient Spanish and 16th century printing thereof, according to our own modern ideas of what it says, is:

"* * * and all that place is called shore of the sea insomuch as it is covered by the water of the latter, however most it grows in all the year, be it in time of winter or of summer."

The word "crece" (third person, singular, of the present tense of the intransitive verb "crecer," meaning, no doubt, to grow, increase, augment itself, expanded or swell) does not seem of itself necessarily to imply either astronomical tide on the one hand or waves or "swells" on the other, although it is not necessarily inconsistent with either. At least in modern usage, and as far back as the first half of the eighteenth century, the related noun "creciente" sometimes means "rise of the water of the sea by effect of the tide (marea)." On the other hand, another related noun, "crecida," means a freshet, or sudden rise of a stream. See *Diccionario de la Lengua Castellana* by the Royal Spanish Academy (edition published during first half of the 18th century; also Vol. 1, p. 404, Diccionario Hispanico Universal, S. A. Horta de Impresiones y Ediciones, Barcelona; Velas-

quez, a New Pronouncing Dictionary of the Spanish and English Languages (1947).

Various legal scholars of greater.or less note have from time to time published translations of the provisions in question made by themselves or copied from others. That of Samuel Parsons Scott, in Las Siete Partidas, Commerce Clearing House, Inc. 1931, which was quoted in State v. Balli, supra, (190 S.W. 2d 71, 100) reads:

"* * * and all that ground is designated the shore of the sea which is covered with the water of the latter at high tide during the whole year, whether in winter or in summer."

This translation is obviously interpretive. The Spanish word for tide, as given in the above cited dictionaries, is "marea," which does not occur in the original. The original word, "en" (in) is translated as "during," although the exact Spanish word for "during" is "durante."

The early official State of Louisiana translation made by Lislet and Carleton reads:

"And by the seashore is understood, all that space of ground covered by the waters of the sea, in their highest annual swells, whether in winter or summer."

This is likewise interpretive. The modern Spanish word for the English noun "swells" is "olas," or perhaps "ondas," and no such word occurs in the original. As stated, the original word "crece" (grows) does not necessarily imply wave action large or small, although it does not necessarily mean the contrary.

The translation in 1 White's Recoplicaion of the Institutes of Aso and de Manuel (1839), also quoted in State v. Balli (190 S.W. 2d 71, 100) is:

"By shore of the sea we understand whatever part of it is covered by water, whether in winter or summer."

This is likewise interpretive, disregarding somewhat the suggestion of movement of the waters contained in the original phrase "quanto mas crece en todo el año" (however most it grows in all the year), although refraining from injecting either of the nouns "swells" or "tide."

In State v. Balli we discussed briefly the definition of the shore, if only in connection with the State's contention there that all accretions to *tidal* boundaries of an 1829 Mexican grant belong to the State, notwithstanding an admittedly contrary rule as to nontidal rivers and lakes. In that discussion, we quoted, without comment, the White and Scott translations, supra, and thereafter gave what appears to be our own translation, as follows:

"* * * all that ground is designated the shore of the sea which is covered with water of the latter during the whole year, whether in winter or in summer." (190 S.W. 2d at p. 100, 2nd col.).

This is substantially the same as the White version, although the latter omits the specific reference, "during the whole year" (with its possible connotation that the shore has to be covered with water each day of the whole year).

The petitioners-plaintiff submit an interpretive translation recently made at their behest by J. L. Battista, Associated Professor of Romance Languages, The Rice Institute, reading as follows:

"By seashore is meant all that space which is covered by the water of the sea at its highest tide during the entire year, be it in winter or in summer."

Rather obviously the original language does not define the upper line of the shore as the highest water levels of winter, whatever may have been stated to the contrary in some of our earlier opinions and in administrative pronouncements. Unless the sense has changed drastically with the centuries, it is inconsistent with such a construction in that it lays no more emphasis on winter than on summer.

Now whether the language confines the shore to that area regularly covered and uncovered by "tide" in the astronomical sense or permits it to be that highest "swell," wave or rise that may occur at this or that one particular hour or minute from whatever force other than storm conditions, the phrase, "in all the year" (en todo el año), undoubtedly leaves a question as to *what year* is meant. Does it mean the last calendar year expiring before the litigation or other effort to fix the boundary on the ground, or some earlier year with a higher water level, or the kind of average of single highest annual levels over several

years, on which the trial court alternatively relied in the instant case, or does it mean that where the *daily* highest levels over a period of years are of record and in evidence, these hundreds or thousands of highest levels should be averaged, and the average taken to be "however most it grows *in all the year?*"

■ Pretermitting for the moment the matter of interpretive authority, we think the language of the *partidas* of itself permits, and common sense suggests, a line based on a long term average of daily highest water levels, rather than a line based on some theory of occasional or sporadic highest waters. Indeed, such appears to us to be consistent with one of the primary arguments of the State itself to the effect that the true line should be one evidenced by more or less permanent markings on the ground of the kind ordinarily associated with the upper line of a shore. Whatever the aspect of the ground in the instant case, ordinarily a "shore line" is one characteristic of regular and frequent coverage by the sea, which in turn is much more closely related to an average of daily highest waters than to one, or an average of merely a few, highest annual readings.

While obviously the word, "average," or its equivalent, "mean," does not occur, both are suggested by the language as a whole, as the learned trial judge evidently recognized. No particular year being indicated as that from which the so-called highest tide or water "in all the year" is to be taken, the inference is that a condition regularly prevailing over a number of years is what was intended, and this in turn suggests a mean taken over such a period. If, for example, the single highest water for each of the five years immediately prior to the litigation were in no instance higher than one foot above mean sea level, but were somehow shown to be three feet in one particular year long prior to the latest five years, it would hardly appear within the reasonable intendment of the law that we should forget the later years and fix the line at three feet according to the one more remote year. Conversely, if the single highest reading for the year just preceding the trial were two feet, while those for each of nine or more years preceding the latest were not over one foot, it would seem unreasonable to require fixing the line at the two-foot level of the latest year, disregarding the lower "highest" levels of all the preceding years. And if we are to use some kind of "mean," as evidently we should, what is there in principle, or in the words of the basic law itself, to require such an average to be that of single highest annual readings for each of the several years in question, rather than one of daily highest readings for all of the days of such years? Both are

averages of *highest water readings*. The only difference lies in the number of highest readings averaged.

The reference in the law to winter and summer does not necessarily require that some single highest water of which proof may be available shall determine the line. It appears simply to take care of a situation in which, by reason of a pronounced difference between seasonal levels, the area in question may over the years be regularly inundated, for example, each summer but only in summer. It has no significance in a situation such as the present in which such inundation as occurs is evidently irregular and with little regard for either summer or winter. It accordingly does not exclude the possibility of basing a line on an average of daily highest levels over a continuous and long period.

Obviously the greater the number of highest water readings averaged, the nearer we come to a figure, or level, which, applied to the ground as a line, will reflect a more regular and permanent shore characteristic than any other. The line will be the one at which the sea most regularly "stops with the shore," and, generally speaking, it will be the line at which the physical features commonly associated with the upper line of the shore most conspicuously appear. Thus it will normally be a more visible line, however it may be under the evidence of the instant case.

Of course, if the "highest" levels were substantially the same on every day, then there would be no such thing as a "single highest water," and thus "mean high water" would necessarily be the test under the Mexican (Spanish) law even as it is under the Anglo-American law. Actually, so far as real "tide" goes, that is the situation in the Laguna, since, as the trial court found, any astronomically inspired changes in levels are insignificant, and the variations are due to meteorological forces such as wind and air density. But these latter variations are quite substantial, both as between different periods of time and between different places with differing exposures to meteorological forces. The finding that the average of single annual highest water over periods of several years was several times as high as "mean high tide (water)" shows that the meteorologically inspired levels on which the former was based were quite extreme or exceptional with reference to the highest waters occurring from day to day. Thus should we base the line, as did the court, on these few exceptional levels, we are likely to have a line of shore which is not shore in the commonly accepted sense of being *regularly* cov-

ered and uncovered by water. It is difficult to believe that the ancient writers of the *partidas* had in mind a shore which was different from the commonly accepted idea thereof. One thinks of shore more in terms of the water's edge than in terms of land which is only occasionally and irregularly inundated.

There are, moreover, sundry practical considerations presented in applying the ancient law to modern Texas which the ancient writers, had they thought of them, would probably have considered relevant to a sound interpretation of their own words.

As before indicated, we believe it essential, as the learned trial judge seemed to suspect it might be, to proceed on the basis of averages over a period of years, whether the basis of the average be only a single highest reading for each of the years concerned or the vastly larger number of daily highest readings. This, in turn, necessitates the use of tide gauges in practically every case. Any proof of even the single highest annual levels from sources other than tide gauges will ordinarily be as unreliable as it will be difficult, and proof as to day by day highest levels would be impossible. At the same time, we know that the number of tide gauges along the hundreds of miles of Texas coast, much of which is remote from population centers, is relatively insignificant, while the number which has been operated as much as a year is smaller still. Obviously in a locality where there is no tide gauge that has been in existence for a good many years, there will be little reliable evidence of the various single highest annual levels upon which to base an average for all those years. So, in such instances, we would either have to rely upon the quite scarce and unreliable evidence from sources other than tide gauges or take the equally unreliable alternative of abandoning the system of averages altogether in favor of accepting proof of one or two instances of highest levels, which some eyewitness might claim to remember, as proof of what is the shore. Both alternatives seem undesirable.

A third and much more reliable alternative, however, is that of following the system of "mean high tide (water)," which in effect is but the average of highest water of each day rather than each year. If that rule is adopted, we can have, by installing a tide gauge for as little as one year near the area in question, the benefit of 365 highest readings upon which to base an average, that it, upon which to determine "mean high tide (water)" at that point for that one year. This mean level will obviously vary less from a corresponding level for earlier (or later) years than would a single highest annual level for one year vary from the

respective highest annual levels of other years. Indeed, as before stated, upon the further and quite simple step of correction against the nearest tide gauge which has been in operation for the full 19-year tidal cycle, the one year "mean high tide (water)" figure of the local gauge will reflect with reasonably close exactness the "mean high tide (water)" for the whole 19-year cycle. In other words, so far as most of the Texas coast is concerned, the only reliable way in which to obtain any sort of average of highest water levels is by use of the standard of "mean high tide (water)."

While this involves a delay of a year, it appears more practical than waiting several years in order to get an average of single highest annual waters over the longer period. In either event, the local tide gauge is necessary because, as stated, water levels vary considerably from place to place in the Laguna, particularly on account of varying exposures to meteorological forces, whereas, by adopting the "mean high tide (water)" standard, the period of tide gauge operation may be reduced to one year.

Now turning to the matter of authority, although there may be in the legal profession of this state a fairly widespread impression to the contrary, we do not consider the foregoing interpretation or application of the *partidas* to encounter any insuperable obstacle in existing interpretive authority, whatever the source.

Actually much of the argument for the State rests on the Roman law as compiled, and no doubt rewritten, under the general title of *Corpus Juris Civilis* ("Body of the Civil Law") by order of Emperor Justinian I, some fifteen hundred years before the present time and nearly a thousand years before publication of the *partidas*. Thus the law of the Romans, or at least Justinian's edition of it, is self-styled the "civil law" and is, moreover, today properly and actually referred to by that term, although the latter has also come to be often employed in a broader and somewhat loose sense, so as to include, besides the ancient Roman law, the laws of those nations of ancient Roman background, such as Italy, France, Spain and the so-called Latin-American offspring of the latter, all of which exist considerably more in code form than in court decisions. While as a matter of form, and possibly also of substance, there is, generally speaking, less similarity between the *Corpus Juris Civilis* and our Anglo-American decisional law (and statutes) than there is between the *Corpus Juris Civilis* and the codes of the other so-called

"civil law" nations, the similarity in the latter instance is far from an identity, as counsel for the State properly concedes, and as State v. Grubstake Investment Association 117 Texas 53, 60, 297 S.W. 202, 204, expressly declares. And with particular reference to the sea shore, obviously the fact that the laws of two civilized nations separated by a thousand years both undertake to define such a universally familiar and important object as the shore does not indicate that the later law was intended by its authors to have the same meaning as the earlier, even were the terms respectively employed more similar than they actually are. Indeed, the contrary is suggested, when we consider that the Spanish law writers probably had access to the Roman law when they wrote their own in different terms. To say, as we did in State v. Balli, that certain provisions of the *partidas*, to wit, those dealing with alluvion and accretion, were "taken from" or "have their origin from" the Roman law, does not mean that even those particular provisions were intended as a mere paraphrase.

The Roman law itself is sometwhat confusing. Book II, Title I, Sec. III of the Institutes ("quatenus hybernus fluctus maximus excurrit") seems to fix the shore lines as that of the highest *winter* wave (assuming *fluctus* to mean "wave," which frequently, but not necessarily, it appears to do), whereas the Pandects or Digest, also a part of *Corpus Juris Civilis,* omits the word "winter" altogether and, while preserving *fluctus,* uses a new verb,*exaestuat,* ("boils up," instead of "rushes forth" as in *excurrit*). Exaestuat evidently has connotations of tide, for which the Latin noun is given as *aestus.* Both the latter and the verb *exaestuare* have a primary significance of heat or effect of heat, hence "a boiling up" or "to boil up." See the two words as translated back and forth in the Latin-English & English-Latin Dictionary of Dr. John T. White (Rev. Ed., 1926) and Cassell's Latin-English and English-Latin Dictionary (Revised) published by Funk & Wagnalls.

So far as the word "winter" goes, the State appears to argue in its answer to the application for writ of error that the *partidas* definition is based on the Pandects, which omit "winter," rather than the Institutes, which include it, or, in other words, that the *partidas* definition does *not* set the shore line as that of highest *winter* water, whatever else it may do. For our part, as indicated earlier in this opinion, we think the words of the *partidas* themselves clearly settle this particular point, without reference to whether their authors intended to paraphrase the Institutes, the Pandects or either.

But even were it beyond doubt, which it is not, that the *partidas* definition was intended as a mere paraphrase of the Roman, and that the Roman in turn refers to the "boiling-up" of a "wave" rather than to the rise of the "tide," we would still be confronted with the question heretofore discussed at some length, to wit—is this one "highest wave" to be that of the year just preceding actual fixing of the line, or some other year or years or an average, and if an average, what kind of average? Once we elect for an average, as the practicalities seem to require, and the texts of neither the Roman Civil Law nor the *partidas* appear to forbid, the sounder course is to take the average of *daily* tide gauge readings of daily highest water, be it tide or a wind-driven wave.

As to commentaries on the *partidas* definition, those of Gregorio Lopez, which appear as Latin (or medieval Latin) footnotes to the text in a Spanish official publication of the latter made between the end of the fifteenth and middle of the sixteenth centuries, are admittedly authoritative. Evidently Lopez was a jurist in the confidence of the then Spanish royal family, a member of the Council of the Indies and, by royal commission, the principal editor of the edition in question. The relevant comment is that appertaining to the phrase *cuanto mas crece,* the original and an English translation supplied by the State being as follows:

"Non intelligas de eo, quod ultra cooperit in plenilunio Martii, vel in autumno in aequinoctio; nam in mari occidentali cooperit prata, et ripas, secundum Joann. Fab. nam illud quod tunc cooperit, non est commune; sed intelliges, quantenus maximus ejus fluctus aestuat in hyeme perenniter, vel aestate, quando fortiter vento concutitur."

\* \* \* \* \* \* \* \* \*

"\* \* \* it must not be understood as to applying to the whole large extension which is covered during the full moon of March or at the Fall Equinox, as happens in the lands adjacent to the western sea, which according to Joann. Fab., inundates shores and fields; therefore, not all the land inundated by the extraordinary flows, must be considered as res communes, but only that part of the land covered by the highest swells in perennial agitation, during the winter as well as during the strong but customary summer storms."

The Latin, written by a medieval Spaniard centuries after the fall of Rome, may well be interpreted with diffidence even

by accomplished scholars of classical Latin; but, subject to this reservation, we presume to agree with the petitioners-plaintiff that the above translation is somewhat free. The last four Latin word would seem more accurately translated as "when strongly by the wind it is buffeted" instead of "during the strong but customary summer storms." Moreover, *maximus* \* \* \* *fluctus aestuat* does not seem necessarily to refer to waves or "swells." *Fluctus* is used in the singular number and when accompanied by the verb *aestuat* (corresponding to the noun *aestus,* which seems often used as meaning "tide") may, as heretofore observed, have the connotation of a mere rise in water levels.

In any event, especially when we consider the reference to the regular tidal forces such as the equinoxes and the moon and the adverb *perenniter* ("perennially, perpetually, continuously") the sense of the comment seems more against the position of the State than for it. According to this Lopez explanation of the *partidas,* extreme and occasional high water levels, even when attributable to astronomic forces, are rather plainly negatived as the test of the upper shore line. On the contrary, the shore is indicated to be that part of the land "perennially" covered and uncovered by the restless sea.

The State not unnaturally relies also upon various opinions of this Court and other courts of this state, principally, and beginning with, City of Galveston v. Menard, 23 Texas 349, from which the State and no doubt some portion of the Bar, deduce that the rule of "mean high tide" (average of the *daily highest tides* over a long period) which is the rule of the Anglo-American law, is not the rule of the Mexican (Spanish) law prevailing at the time we are considering; but that the latter rule declares for a higher line.

It cannot, of course, be denied that language in these opinions, especially in the Menard case, supports the State's position. But candor also requires the admission that this language is confusing as to exactly what the Mexican (Spanish) law rule is as applied to a case like the present or even as applied to the State's present view of what the rule exactly is. More importantly, it must also be conceded that in none of the cases in question did the decision turn on whether the Mexican (Spanish) rule was one other than "mean high tide."

In the first place, the Menard case and most of the others repeatedly speak of the Mexican (Spanish) rule (or "civil law" rule, as they generally call it) in terms of "tide," as distin-

guished from the State's present emphasis on "waves" and "swells." Moreover, they state the rule in terms of highest *winter* levels as if taking it from the Institutes, which, as we have stated, and as the State at one point seems to concede, is quite inconsistent with the language of the governing law, to wit, the *partidas*. The language used is general, neither the Roman law nor the *partidas* being quoted or even referred to in specific terms, still less analyzed in critical fashion.

The State here argues, or so we understand it, that, in the Menard case, the Court had in mind following the. Institutes and rejecting the Pandects, *but* was concentrating on the idea of single or occasional highest wave or waves rather than on the modifying adjective "winter" *(hybernus)*. Rather, we think the Court treated the whole subject rather incidentally, since it was not actually an issue in the case. The issue was whether the intent of the grant by the Republic of Texas (1838) of a portion of Galveston Island, for purposes of founding a city there, was to include certain flats lying between the *channel* of the bay and the undoubted upland, the State, of course, owning both flats and upland at the time of the grant, and the grant stating the seaward boundary to be, *not* the shore, but "the channel of the bay." Counsel in the case did, indeed, seek to inject the question of proper definition of the "shore" (although "shore" nowhere occurred in the grant) and the Court's reference to it was in response to these suggestions. But what the Court *held* was this: that *whatever the "shore" rule prevailing in 1838,* the parties to the grant intended the *channel* to be the boundary. This is quite plain from the Court's own language following its statement that the "civil law" rule is that of "highest tide in winter." The court said:

"The rule at common law, would restrict the grant to the line of ordinary high tide. Even ordinary low tide would leave a strip in front of shallow water, over three hundred feet. At none of these points would wharves have accomplished any beneficial connection with the navigable water of the channel. We cannot entertain the idea for a moment, that the parties contracting, in reference to the erection of this commercial city on the bay, contemplated it to be laid off south of the highest tide of winter or even of ordinary high tide, and made no provision whatever for vesting in any one the right to erect permanent wharves, to communicate with the channel."

The statements as to the meaning of the "civil law" rule

were undoubtedly dicta and, as regards the "in winter" feature, are in conflict with the definition in the *partidas*.

Galveston City Surf Bathing Co. v. Heidenheimer, 63 Texas 559, involved the question of the power of the City of Galveston to grant exclusive rights to a portion of the shore and bottom of the Gulf of Mexico in or adjacent to the city limits. The limits were coterminus with the Menard grant, but the city did not pretend to hold *title* to any of the area in question from Menard or otherwise. The Court did state the "civil law" shore line to be that of "the highest tide in winter" and spoke of the latter as a different thing from the "common law" rule of "ordinary high tide" (mean high tide). But, similarly to the Menard case, it held that, *whatever the rule,* the City had no power to grant exclusive rights, being in no event *the owner* of any of the area in question. The Court accordingly said, "It is immaterial whether the grant to Menard, as to its boundaries, be considered in the light of the civil or common law, so far as this appeal is concerned." The statements on which the State relies are undoubtedly but dicta.

Hynes v. Packard, 92 Texas 44, 45 S.W. 562, and the earlier related case of Rosborough v. Picton, 34 S.W. 791, Texas Civ. App., no writ of er. history, both involved a pre-1836 grant by the Commissioner for Power and Hewitson's Colony which was said to include a large area of admittedly submerged lands in a bay. In the Rosborough case the question was whether a later private, by-the-acre sale, of the grant or part of it was voidable because including in the total area purportedly sold the large acreage corresponding to the submerged land. It was held that the submerged land was not included in the original grant and that accordingly the description in the later sale was wrong. The court said:

"According to both the common and civil law, an ordinary grant of land along the seacoast, made by the ministerial officer of the government, did not pass the title to land under water or beyond the coast line. This line was fixed by the common law at the point reached by ordinary high tide, and by the civil law at the mark of the highest tide."

The Hynes case was a breach of warranty action concerning a sale of the same land involved in the Rosborough case. On the strength of the latter decision, it was held that there was a failure of title to the submerged land, since it had not passed out of the sovereign by the original grant. The determining fact

being that a large portion of the acreage in the grant was actually bay bottom, and no point being made in the litigation as to any difference in that acreage that might result from differences in definition of the shore line, the shore line question was not involved in either case; and the statements in this connection are necessarily dicta.

Heard v. Town of Refugio, 129 Texas 349, 103 S.W. 2d 728, involved, among other things, interpretation of what was in effect a Mexican grant to the town, an issue being whether the "grant" included the bed of the river that ran through the area granted, although the bed was not specifically dealt with in the grant. In ruling that the grant did not include the river bed, we gave various reasons against a contrary interpretation, including the reason that Mexican law "was most favorable to public ownership." As evidence of this latter policy we cited various examples of Mexican law, including among these the statement that its definition of the shore line was the line of "highest tide in winter" as contrasted with the "common law" line of "ordinary high tide," citing the Menard case, supra. Obviously the correct definition of shore line was not in issue, and the court was not purporting to render a decision on the point, however logical its reference to what it then undoubtedly thought to be the Mexican shore line rule.

Curry v. Port Lavaca Channel & Dock Co., 25 S.W. 2d 987, Texas Civ. App., no wr. of er. history, involved a suit by the Channel & Dock Company to recover from another private party (Curry) possession of a certain area upon which the State had, by a charter, given the former the right to conduct its corporate channel and dock operations for fifty years. Apparently much of the area in dispute was the submerged bottom of Lavaca Bay, but some part of it evidently lay at or near the water's edge and was claimed by Curry, although on what ground is not entirely clear. In the course of the opinion, which deals with various questions not presently relevant, it is stated that the Sanchez League (evidently the abutting upland) which called for the bay shore as a boundary, was a Mexican grant and accordingly went no further seaward than the line of highest tide. The Court also stated that part of the area in dispute was covered by two or three feet of water at highest tide—seemingly as a regular occurrence. Whether the appellant-defendant Curry was relying on "mean high tide" as a different and, to him, more favorable rule does not appear, nor is it disclosed whether "mean high tide" was or was not lower than what the Court meant by "highest tide." The decisions is not persuasive.

The same is to be said of Dincans v. Keeran, 192 S.W. 603, Texas Civ. App., no wr. of er. history, in which Dincans et al, appealed from an injunction restraining them from going upon lands within the fence of the Keerans. The fence lay along a tidal stream and on some undisclosed line "between the low and highest tide." The appellate court modified the injunction so as to limit it to property above "highest tide," which it said was the boundary of the Keeran lands under the applicable "civil law," the grant under which they held being made in 1833. Just what was meant by "highest tide," and whether an issue as between it and "mean high tide" was made by the parties, the opinion does not disclose.

■ Humble Oil & Refining Co. v. Sun Oil Co. (5 Cir.) 190 Fed. 2d 191, rehearing den., 191 Fed. 2d 705, a case somewhat similar to the present, was decided against the owners of the abutting Spanish and Mexican grants and in its opinions contains statements corresponding to the aforementioned dicta of our Texas courts as to a purported difference between the respective Mexican (Spanish) and Anglo-American definitions of the shore. However, after a thorough reconsideration of that decision, which we have previously considered in other litigation, we do not find it to be compelling authority on the point here under discussion. In the first place, we regard it as having rested primarily upon the fact findings of the trial judge to the effect that the accretions, upon which the private landowners had to rest their claim, were not accretions to their property, but to the property of the State—a matter hereinafter more fully discussed. In the second place, the language of the court concerning the definition of the shore was with reference to Texas lands, and thus necessarily influenced by the dicta on that subject in our own opinions. Our own interpretation of Mexican (Spanish) law as applied to Texas land titles is as binding on the federal courts in such a case as is our interpretation of any Texas land law in any matter of Texas land titles. And a federal court would naturally be more reluctant than we ourselves to disregard our language as dicta in a matter well within our exclusive competence.

It is, moreover, worth noting that the federal court did not adopt the interpretation which the State now seems to some extent to assert, to wit, that the definition in the *partidas* refers to the line of highest "wave," as distinguished from tide. On the contrary, it used the same language of our own earlier decisions, "highest *tide* in *winter*," the "tide" and "winter" parts of which the State now appears to regard as less sacred than

the one word "highest." The court, indeed, uses language indicating that it regards the shore like we have now concluded to regard it, to wit, as that part of the land regularly covered and uncovered by the tide, the upper line of which is best determined by the 19-year average of daily highest water readings.[2]

While several of our sister states were once subject to Spanish or Mexican rule and have accordingly had occasion to deal with Spanish or Mexican grants along tide water, we are cited to no decision from any of them applying, or declaring, the Spanish law definition as the dicta in our earlier decisions declare it or as the respondent-defendant would have us here declare and apply it. Indeed, the decisions from, or relating to, those states cited for the petitioners-plaintiff rather indicate their concept of the Spanish law rule to be the same as that of the Anglo-American law. Apalachiola Land & Development Co. v. McRae, Commissioner of Agriculture, 86 Fla. 393, 98 So. 505, 517; Brickell v. Trammell, Governor, 77 Fla. 544, 82 So. 221, 227-229; (both by the Supreme Court of Florida); United States v. Pacheco, 2 Wall, 587, 17 L. Ed. 865; City and County of San Francisco v. Le Roy, 138 U. S. 656, 671, 11 Sup. Ct. 364, 34 L. Ed. 1096 (California cases involving Mexican grants along tide waters); New Orleans Land Co. v. Board of Levee Commissioners (a Louisiana Supreme Court case involving French and Spanish grants along Lake Pontchartrain) 171 La. 718, 132 So. 121, 122.

The American courts for Puerto Rico appear likewise to have regarded the Spanish definition as calling for the line of mean high water ("the highest *regular* tide"). People of Porto Rico v. Fortuna Estates (Circuit Court of Appeals) 279 Fed. 500, 506 (cer. den. 259 U.S. 587, 42 Sup. Ct. 590, 66 L. Ed. 1077.

Theoretically, the rule of mean high tide is less favorable to the State in its capacity as a landowner than a rule based on a single instance of highest annual water or a mean of several such instances. But that is not a reason for our interpreting

2.—"The tide is the rising and falling of the waters of the sea that is produced by the attraction of the sun and moon uninfluenced by special winds, seasons, or other circumstances * * *. The tide delimits the shore, and it is no respecter of the conflict of laws. Meteorological influences may be inextricably involved with the rise and fall of the true astronomical tide, but we should distinguish them as meteorological tides. Other influences may be described as atmospheric meteorological tides, but such tides are undoubtedly very minute, in comparison with the true astronomical tide over a period of 18.6 years * * *. Shore is sometimes said to be synonymous with 'flats' * * * but flats are not shore unless the tide ebbs and flows over them * * * *." 190 Fed. 2d 191, 195.

the law differently than we would if only private interests were involved. Moreover, we are far from sure that in actual practice the rule of mean high water is less favorable than a rule calling for a higher shore line that will always be vague and difficult of ascertainment until finally fixed on the ground after extended and complicated litigation. A result of the latter kind of rule may well be to give the abutting private landowner (and his mineral lessee) an advantage over the State in the inevitable litigation, because he has longer and better access to the kind of proof that will necessarily be involved in demonstrating whether on such and such an occasion in such and such a year or years one or more "highest waves" actually reached this or that irregular line on the ground. Another result may be to discourage the mineral leasing of tidal areas from the State by smaller operators who cannot run the risk of complicated boundary litigation in addition to the other risks of mineral exploration.

We sustain the contention of the petitioners-plaintiff that the applicable rule of the Mexican (Spanish) law is that of the average of highest daily water computed over or corrected to the regular tidal cycle of 18.6 years. This means in substance mean high tide.

█ But there remains the vital question as to the character and distribution of the accretions, because admittedly the mere fact that the area in suit has become upland or fast land does not make it the land of the petitioners-plaintiff. Presumptively it is the land of the State, and the burden rested upon the petitioners-plaintiff to prove that it was a true accretion in the sense of a natural and imperceptible deposit and that it was an accretion to the original boundary of the grant. Humble Oil & Refining Co. v. Sun Oil Co., 190 Fed. 191, Fed. 705, supra. The trial judge found to the contrary, most of his finding being set out in the footnote[3], and after ourselves reviewing the hundreds of pages

---

3.—The 18th of the trial court's original findings reads:
"No doubt some portion of the build-up of the flats area, through the many, many years, has come from material brought into the Laguna Madre from the mainland, from the Resaca de los Cuates, as well as elsewhere along the immediate vicinity of the coastline. On the other hand, the physical facts are such that it is apparent, and is here found, that much of the build-up of such flats through the years has come from other sources such as from the nearby islands of Yucca, North Three Islands and Horse Island, materials coming from the sea, itself, such as sea grass and material churned from the bottom of the Laguna Madre and deposited through the water's actions. Also the spoil banks in the immediate vicinity thrown out along the artificial canals dug through the Laguna Madre, and hereinabove referred to, inevitably have contributed material deposited upon the flats in question, carried there by the currents of the waters which was constantly through and about the bases of such spoil dumps and by the winds. Also, while the extent thereof cannot be from the evidence offered in this case measured, the throwing up of the dirt dump between the mainland and Horse

of testimony, we agree with the Court of Civil Appeals that the failure of the trial judge to be convinced by the proof for the petitioners-plaintiff was not beyond the pale of what a reasonable mind might have done.

Our summary of the facts heretofore made itself largely answers the question. To be sure, most of the evidence was that produced by the petitioners-plaintiff. It was voluminous, perhaps ample to have sustained findings contrary to those actually made. But to say that the court, as a reasonable man, had to be convinced by it is something else. It was largely the opinion of an expert witness, who based his ultimate conclusions upon his own subsidiary conclusions and theories concerning geological and related history going back thousands of years, including drill cores, which are not altogether intelligible to the lay observer and admittedly had large historical gaps between the various periods they were said to represent.

---

Island has blocked the flow of the water between said island and the mainland so that waters on the flats to the South of Horse Island are left in a sort of pen at such point, with natural increased tendency to drop its deposits along such vicinity. Some of these factors have tended to build the flats area upward from the bed of the Laguna; some have tended to build outward from the Islands and some outward from the mainland. The net result has not created fast land to this date.

"However, if the court should be mistaken as to its conclusions as hereinabove stated with reference to such build-up of such flats, and even if such flats should be found to be fast land and to represent accretions to the mainland and to the Islands at the present time, still, if such be the case, it is not possible to reasonably apportion such accretions between the mainland and such islands, and especially so in view of the unmeasured, but nevertheless present, contributing factors resulting from the various artificial changes or structures made and constructed in the immediate vicinity, and hereinabove mentioned and referred to."

Upon request of the petitioners-plaintiff for additional and specific findings, the Court made further factual rulings as follows:

In response to request No. 21 (to find that the Resaca de los Cuates still drains water from the natural watershed through which it flows and carries water from the Rio Grande which enters it in time of flood).

"21. Plaintiffs' Requested Finding No. 21 is denied, the same representing merely evidentiary matter and not representing any ultimate fact issue. In addition, such finding is misleading in that the evidence does not show that the Resaca de los Cuates is at present a flowing stream and in that the evidence shows that for many years flood waters from the Rio Grande River have been protected or confined on the Texas side of such river by the flood control system of levees erected and constructed along the Texas side of such river."

In response to request No. 22 (to find that the waters of the Resaca de los Cuates carry alluvial sediments in their flow).

"22. Plaintiffs' Requested Finding of Fact. No. 22 is denied, the same representing merely evidentiary matter and not representing any ultimate fact issue, although it is here found that such waters as come from the Resaca de los Cuates into the Laguna Madre do carry sediments therein."

In response to request No. 26 (to find that the sediment carried by the Resaca de los Cuates precipitated out upon entering the "still waters of the Laguna Madre").

"26. The Court refuses Plaintiffs' Requested Finding of Fact No. 26, the same representing merely evidentiary matter * * *. In addition, as has already been

■ While, in a limited sense, all testimony may involve opinions of the witnesses, the proof here was peculiarly of the "opinion" or "expert" type, and the occasion has to be at least highly exceptional when such testimony, even though not contradicted by an opposing expert, must be deemed true as a matter of law. In Hood v. Texas Indemnity Ins. Co., 146 Texas 522, 209 S.W. 2d 345, 346, we said, "That character of testimony is but evidentiary and is never binding upon the trier of facts," which means at least that the mere qualification of a witness as an expert does not cut off the fact-finder from exercising considerable judgment of his own about how far his opinions are to be relied on. And it is certainly no less so where, as here, the expert is an employee of the party for whom he testifies, a person who, with all respect to him, cannot be said to have enjoyed outstanding experience or fame in the particular field, and who did at least a large part of his study of the particular subject with a view to testifying for his employer in the particular case. The matter

---

found by the Court in its findings of fact, the waters of the Laguna Madre do not remain 'still waters.' However, it is perfectly apparent and the Court does find that such sediment in the waters as are carried into the Laguna Madre from the Resaca de los Cuates are precipitated out, in large part, upon entering the Laguna Madre."

In response to request No. 27 (to find that the area in suit was gradually formed by alluvion between 1829 and 1930).

"27. The Court refuses Plaintiffs' Requested Finding of Fact No. 27 in that the findings of the Court in this connection have been reflected under the Court's original finding of Fact No. 18. Furthermore, as indicated in the Court's original finding of fact, the Court is not of the opinion that all of the build up in connection with the mud flats in controversy occurred between 1829 and 1930."

In response to request No. 28 (to find that the lands in suit were gradually formed by precipitation of the sediment from the Resaca de los Cuates).

28. The Court denies the request "in that the Court's Findings in this connection have been reflected in the Court's original finding of Fact No. 18 and for the additional reason that the Court is not of the opinion that all of the lands in controversy were formed from sediments precipitated by the Resaca de los Cuates."

In response to request No. 29 (to find that the area in dispute was formed gradually through the imperceptible deposit of alluvion from the waters of the Resaca de los Cuates as they entered the Laguna Madre).

29. The Court denies the request for the reason that the subject matter is covered by the Court's original finding No. 18 "and for the further reason that the Court has already found that the build up of the mud flats area in controversy has not been merely through deposits coming from the Resaca de los Cuates but that such build up has resulted from various and sundry causes as referred to in the Court's original findings of fact in this cause."

In response to request No. 31 (to find that as the area in suit gradually formed by alluvion, some of it attached to the islands and some to the mainland until the entire area became one sometime between 1920 and 1930).

31. The request is refused because of the subject matter being included in principal finding No. 18 "and for the further reason that the court has already found in its original findings of fact that such mud flats area has not become a part of the mainland either between 1920 and 1930 or at any other time."

In response to request No. 32 (to find that "The line of adjoiner between the accretions to the mainland and to the islands is as indicated on Plaintiffs' Exhibits Nos. 4-C and 4-D"), the Court refused so to find, stating the subject matter to be covered by its original finding No. 18.

of credibility of the witness, that is to say, the extent to which his judgment, like that of all humans, however learned, may or may not be overconfident, zealous or "slanted," is surely not altogether beyond the reach of the fact-finder. For example, where, as here, the expert is a geologist and testifies both as a geologist and an *ad hoc* expert in botany, his botanical testimony being contradicted by a professional botanist, the fact-finder might properly conclude not only that the former was in error in his botanical conclusions, but also that his geological opinions are not above question.

As before indicated, the factual theory of the petitioners-plaintiff is that the alleged accretions came about by gradual deposits of alluvion brought from the mainland and the Rio Grande by the fresh water of the Resaca de los Cuates and precipitated out upon reaching the waters of the Laguna. No doubt fast land arising from such a process, in so far as purely natural and imperceptible, would constitute accretions in the legal sense, and thus could, under the Mexican (Spanish) law as declared in State v. Balli, supra, belong to the private owner of the abutting upland rather than to the State.

■ But, as clearly deducible from Giles v. Basore, 154 Texas 366, 278 S.W. 2d 830 (supra), and the authorities therein cited, the mere fact that fast land has arisen by accretion and even adjoins the older upland does not necessarily make it the property of the upland owner. If the process starts at an island or creates an island or a high point in the sea bottom and from there moves toward the older upland or mainland, becoming fast land as it goes, this new fast land is undoubtedly the property of the State.

The process of legal accretion being by nature so slow as to be imperceptible, the owner of the old upland, in areas such as that here involved, will, indeed, often find it quite difficult to establish particularly beyond the ability of reasonable men to differ, that the accretions were accretions to his property rather than to the property of the State. But this is no great reason to strain a point in his favor, since we would not do so on behalf of the State, were we dealing with the converse situation of a suit by the latter based on erosion of the original grant by the sea. And we see no way to simplify the problem, unless by overturning the rule of State v. Balli, supra, and later decisions, to the effect that accretions to private land on tide water belong to the owner of the latter rather than to the State.

It is, of course, conceded by the petitioners-plaintiff that at

least a substantial amount of the area in dispute actually represents accretions to the so-called islands eastward from the original limit of the grant. While, as the trial court appears to agree, some alluvion from the Resaca de los Cuates may have precipitated out immediately upon entering the Laguna and thus have built up from the original boundary of the grant toward the sea, the extent of any such build-up is obviously a matter of opinion. It is even a mere matter of opinion that the Resaca supplied most of the soil in question, since, as the court's finding indicate, the waters of the Laguna have always been in motion to greater or less degree, and part of the soil may have come from other sources. The physical fact of the low area considerably westward of the line said to mark the westwardly limit of the accretions to the "islands" indicates that there was at least a simultaneous build-up from the islands, or from some point westwardly thereof, toward the mainland, and that it extended considerably farther toward the mainland than the petitioners-plaintiff contend to be the case. Assuming that, during some period between thirty and fifty years ago, a large amount of muddy water did come out of the Resaca, so as to make a gradual deposit on the area in suit, we cannot say it is beyond the pale of reason to believe that considerably more of it was precipitated out at a point eastward of the original line of the grant than at the line itself.

As stated, the time when the decisive build-up of the area from the action of the Resaca de los Cuates is claimed by the petitioners-plaintiff to have occurred is somewhat obscure but of rather recent date, the theory evidently being that the area, over the centuries, built up, was eroded away and then recently built up again to its present status. We do not find the evidence altogether convincing that the Resaca during the later period did carry a heavy flow of alluvial waters into the Laguna to the area in dispute. Rather, to judge by more or less contemporary maps, the main streams, or what might be called streams, in the general vicinity were to the west and north of the Resaca de los Cuates and came into the Laguna at points considerably north of the area in suit.

Nor can we say that the trial judge was unreasonable in attributing significance to the dredging operations in the neighborhood of the area either from the standpoint of furnishing some amount of the soil that went to form the flats in suit or from that of causing an artificial or man-made build-up of the area through restricting the movement of the Laguna waters and thus causing precipitation of earth that would not otherwise have occurred. While these dredging operations were had some

ten years later than the period at which the principal build-up of the flats is claimed by the petitioners-plaintiff to have materialized, the whole matter is so much one of opinion that the court's own inferences as to the time of various events or conditions can hardly be said to be arbitrary. Somewhat the same thing may be said as to the court's consideration of the damming up of the channel between the southwest end of Horse Island and the mainland between 1924 and 1934. The obstruction in question was undoubtedly an artificial work, and impeding the flow of water, as it did, from the north onto the flats area, might well have contributed substantially to the ultimate build-up of the flats.

What we have said above is, of course, intended as merely our own reasoning as to why the court's findings, which naturally involve both positive and negative conclusions on the court's part, are not beyond the pale of what a reasonable man might conclude from the evidence. Obviously we do not presume to say which way the evidence preponderates.

■ As to the alternative contention that the Court of Civil Appeals in effect failed to pass on the point of the petitioners-plaintiff attacking the trial court's findings as so against the overwhelming weight and preponderance of the evidence as to be manifestly wrong, we conclude that on the record this point must be sustained and the cause accordingly remanded to the the Court of Civil Appeals. In re King's Estate, supra.

The appellate court did, indeed, state at the conclusion of its opinion that "Accordingly, each of the appellants' points is overruled * * *." In the preceding paragraph it also stated that, "Because we are of the view that the evidence is sufficient to sustain the findings of fact of the trial court, * * *." The court, moreover, was conscious of the particular fact findings last above discussed (those quoted in our footnote 3), because it quoted them along with those which it discussed. However, there actually was no specific discussion of the findings on which our opinion now causes the case to turn, and while the court may well have intended to rule on the question of the overwhelming weight and preponderance of the evidence as to all findings made by the trial judge, some of the language does throw doubt on the matter, for example, the statement that "Needless to say, if the findings of the trial court are supported by probative evidence, his conclusions of law must be sustained." (289 S.W. 2d 357, 379), and the further statement that "First of all, judgment by the trial court will not be set aside if there is any evi-

dence of a probative nature to support it * * * ." (289 S.W. 2d 357, 375). Such statements are appropriate to the question of "no evidence," but less so to that of overwhelming weight and preponderance, and we find no language in the opinion peculiarly appropriate to the latter question. Considering all of the foregoing, there would appear to be enough doubt about the matter to justify, in fairness to the petitioners-plaintiff, that, instead of affirming the judgment of the trial court, we should remand to the Court of Civil Appeals for a ruling on the question of great weight and preponderance of the evidence as applied to the particular fact findings in question.

If the court rules that the particular findings are not so against the overwhelming weight and preponderance of the evidence as to be manifestly unjust, it is instructed to affirm the judgment of the trial court; otherwise to reverse and remand the case for a new trial consistent with the holdings in this opinion.

The judgment of the Court of Civil Appeals affirming that of the trial court is accordingly reversed and the cause remanded to the Court of Civil Appeals for further proceedings.

Opinion delivered June 18, 1958.

ON MOTION FOR REHEARING

MR. JUSTICE GARWOOD delivered the opinion of the Court.

Our original opinion has been criticized, and no doubt justly so, for some confusion as to whether the landward line of the shore as regards abutting Spanish or Mexican grants is that of mean high tide or mean higher high tide, since along the Texas coast there are generally two daily high tides and two daily low tides. While the difference, particularly in the Laguna Madre, is small, it conceivably could, in a given case, be substantial from the standpoint of acreage involved. It was our intention to hold, and we do hold, that the line under the Spanish (Mexican) law is that of mean higher high tide, as distinguished from the mean high tide of the Anglo-American law.

Certain *amici curiae* arguments on rehearing have urged that shore at Surfside Beach in Brazoria County and various other Gulf Beaches commonly used for public recreation, will be much narrowed (from seaward to landward) and thus undesirably limited in usage, as the result of defining the shore line in terms of tide gauge readings. It is said that if we should

base the shore line on the actual, day by day, reach of the highest water upon the beach, which can be observed, and the corresponding levels noted, about as easily as reading a local tide gauge, the altitude of an average line thus established will be very much higher than that of a line based on tide gauge readings and thus formed by the intersection with the land of a plane drawn through the level of mean higher high tide as determined by the tide gauge. In other words, it is said that the level of mean higher high tide, as it exists on the beach itself, is one thing but, as determined by tide gauges, is quite another. Presumably this would be no less true of the level of mean *high tide*, if that were the line involved.

The factual basis for this argument is allegedly reflected in a surveyor's report annexed to the corresponding brief on rehearing. The report in turn seems to rest on a single observation made at Surfside Beach on May 14th, 1958, without comparison with a local tide gauge (the Galveston gauge some forty miles away being used), and its factual correctness is challenged by the respondents Luttes et al. Nor do we know of any decision concerning either the Spanish (Mexican) law shore line or the Anglo-American line of mean high tide, which rejects the use of tide gauges as the basis for fixing the line. As regards the line of mean high tide, Borax Consolidated v. City of Los Angeles, 296 U.S. 10, 56 Sup. Ct. 23, 80 L. Ed. 9, strongly suggests that the Court had tide gauge readings exclusively in mind; and if *that* line be thus properly defined in terms of tide gauge readings (and accordingly applied to the large portion of the Texas coast governed by the Anglo-American rule of mean high tide) it is hard to see how it should be otherwise with a line of mean higher high tide.

On the other hand, we are not bound by the Borax Consolidated case. And while Arts. 5415a (Sec. 3) and 7467, Vernon's Texas Civ. Stats., use words such as "tide" and "high tide," the former also includes the phrase "lands covered by the waters of * * * ." See City of Galveston v. Mann, 135 Texas 319, 143 S.W. 2d 1028. Nor can we say for certain that the factual data supplied by *amici curiae* is wrong. Conceivably the winds or other physical forces do regularly cause the levels reached each day on the beach by the highest water to be far higher than the daily levels of highest water as shown by a tide gauge. Nor, however difficult it might now appear to us (or to the Surveyors Association of Texas, according to the report of its Boundary Commission of March 21st, 1957, transmitted to the Comissioner of the General Land Office under date of April 1st, 1957) to de-

termine what the level of either mean higher high tide or mean high tide is in terms of the reach of water on the beach, can we be sure that is impossible, particularly having in mind such measuring techniques as science may hereafter afford.

Whatever may be the case as to that part of our shores governed by the Anglo-American rule of mean high tide, we do think it correct to say that the Spanish (Mexican) law concept of the shore is the area in which land is regularly covered and uncovered by the sea over a long period. If it be shown in a given case that the upper level of the shore, as actually covered and uncovered by the sea, is higher (or lower) than the level of mean higher high tide as determined by tide gauges, and if it also appears that an upper median line of the shore, as actually so regularly covered and uncovered, can be determined with reasonable accuracy otherwise than by exclusive resort to tide gauges, we do not by our opinion intend to foreclose such a case.

In the instant case, it is quite plain to us that the area in suit is not regularly covered and uncovered by the Laguna waters and has not been for a long time. To say that merely because there exists, at the western edge, a "bluff line" or a vegetation line," marking where the waters at some undisclosed period in the past evidently did reach with regularity, the latter line is the line of mean higher high tide, would, in our opinion, be much less reasonable than to fix a line of mean higher high tide by exclusive resort to tide gauges. We have no doubt that the area in suit is fast land.

Vigorous objection has also been made to the inference or assumption in the latter portion of our original opinion to the effect that upland formed by accretions due wholly or in substantial part to human agencies, as distinguished from purely natural causes, belongs to the State rather than to the abutting landowner. What we said in this connection grew out of our having interpreted the fact findings as resting in part on that same assumption, which in turn appeared to be uncontested. However, on reconsideration we conclude our interpretation of the fact findings to have been erroneous. What the trial judge had in mind was merely that the deposits on the flats in controversy might well have been due in large part to soil from sources other than the Resaca de los Cuates. Although those sources were ultimately of human origin, the point was, not the human origin, but the likelihood that they facilitated a build-up of the flats from the islands or points between the latter and the

original shore rather than from the original shore toward the islands. The law question of whether accretions resulting from human agency may or may not belong to the abutting landowner is thus not in the case, and our original opinion is accordingly modified and to be construed as not ruling on that point, whatever its language may suggest to the contrary.

This latter modification or explanation does not alter our view that the fact findings are not, as a matter of law, wrong. Our judgment will therefore remain undisturbed.

Subject to the modifications in our original opinion which are specified above, the motions for rehearing of both the petitioners and the respondent are overruled.

Opinion delivered December 10, 1958.

MR. JUSTICE SMITH dissenting.

This case being before us on motion for rehearing, I have concluded to withdraw my original dissenting opinion and substitute the following therefor. Originally, I was content to note my dissent without writing fully upon some of the questions which I thought were incorrectly decided. Reference was made to my dissenting opinion in Rudder v. Ponder, 156 Texas 185, 293 S.W. 2d 736, 743. In that case, it was my contention that the law as incorporated in *Las Siete Partidas* applied and that the rights of the parties must be determined by the civil law in effect at the time of the grant. It was my impression that several members of this Court agreed with me on this point, but agreed with Mr. Justice Griffin that the land certificates issued in 1837 created an incomplete, inchoate, and equitable right which did not become vested (until a patent therefor was issued) in 1841, a date subsequent to the adoption of the common law of England. Therefore, for that reason only, the seaward boundary of the land was controlled by the rule of the common law, and that under the common law the seaward boundary of the land extended to the point of the mean high tide. The controlling question in the Rudder case, supra, is not in the instant case. Therefore, it seems to me that this Court should be in agrement that whatever is written, whether it be dicta or what not, should be in harmony with the civil law, and it should be made clear that the common law has no application. When such a rule is followed, then the question raised by some that there is little difference between the civil law and the common law in determining the question of whether the "mud-flats" involved in this

suit have accreted to the mainland and become "fast land," and hence belongs to J. W. Luttes et al. or have remained a part of the bed and shores of the sea, and, therefore, belongs to the State of Texas.

In determining the issue in this case, we should not lose sight of what this case is about, and the principles of law which should primarily control in determining the rights of parties in a trespass to try title suit.

The petitioners, Luttes et al., brought this trespass to try title suit against the State of Texas. The land sought to be recovered was described by metes and bounds and alleged to comprise some 4,086.61 acres. The land was alleged to be located in Cameron County, Texas, along the east or Laguna Madre side of the original Mexican Patrero de Buena Vista Grant made by the State of Tamaulipas, Republic of Mexico, to Manuel de la Garza Sosa in the year 1829. This grant was a riparian one fronting upon and being bounded on the east by the Laguna Madre, a comparatively shallow bay, or arm of the Gulf of Mexico, located between Padre Island on the east and the mainland of Texas on the west. Petitioners, Luttes et al., based their claim of title to the mud-flats upon claimed accretions to the portion of the mainland covered by such grant.

The State of Texas answered this contention of petitioners with a general denial and a plea of not guilty of the wrongs, charges, and trespasses alleged in petitioners' petition. At the close of the evidence, petitioners, Luttes et al., filed a motion for judgment for a specific area of 3365.52 acres of land, "* * * including all lands within said metes and bounds that have been added to the open face of Potrero de Buena Vista grant on Laguna Madre through slow and gradual processes of accretion and reliction, and imperceptible deposit of alluvion, since said Potrero de Buena Vista grant was released and relinquished by the Legislature of the State of Texas to Manuel de la Garza Sosa, under whom plaintiffs hold and claim the lands above described." The State of Texas also filed its motion for judgment (1) that the plaintiffs recover nothing and that all costs be taxed against plaintiffs, and (2) *in the alternative* that the "judgment should provide that the boundary line between the Luttes property and the State's property should be fixed at the line near the foot of the mainland bluff where the mud flats end and the upland begins." The trial court granted the State's motion and denied the Luttes et al. motion for judgment. Judgment was rendered that Lutes et al. take nothing by reason of their suit and the fee

simple title was vested in the State of Texas. The land was described in the judgment by metes and bounds as being 4086.61 acres of land. The metes and bounds description is the same in the judgment as the metes and bounds description contained in the Lutes et al. petition upon which the case went to trial.

It was undisputed, and it was agreed between the parties that the plaintiffs-petitioners J. W. Luttes owned title to all of such Mexican Grant which was relevant to a determination of the issues in suit. In other words, Luttes owned the upland adjacent to the land sued for without dispute. Of course, the ownership was subject to an oil and gas lease in favor of petitioner, Shell Oil Company. It was and is admitted that the mud-flats area (4086.61 acres) in controversy was not a portion of the original Mexican Grant. The burden rested upon Luttes et al. to establish by competent evidence that since the original grant was made, the mud-flat area sued for as it now exists had been added to the upland grant now owned by Luttes through the slow and gradual process of accretion and reliction and that such area thereby became a part of the Texas mainland, and particularly the Luttes land lying west of the area sued for.

Thus, an issue of fact was presented. The trial court without the aid of a jury concluded that the area involved had not been shown to have accreted to the mainland, as contended for by Luttes et al. and that such area had not in fact become a part of the mainland, but, in fact, remained a part of the bed and shores of the sea and belonged to the State of Texas. The Court of Civil Appeals affirmed the judgment of the trial court. 289 S.W. 2d 357. The Court of Civil Appeals minutely and in great detail points out wherein the petitioners-plaintiffs failed to discharge their burden of proving title to the land in dispute. The question of accretion has been correctly decided adversely to all contentions made by Luttes et al. Therefore, there is no question as to the ownership of the 4086.61 acres sued for. The only remaining question, if it has been properly raised, is the location of the shore line of Laguna Madre along the Buena Vista Grant. Simply stated, where is the shoreline between the upland owned by Luttes et al. and the 4086.61 acres awarded to the State of Texas in this suit. If, in the opinion of the Court, this question cannot be litigated in a new suit, and that the determination here adversely to petitioners Luttes et al. would be res adjudicata, then the issue as to the shoreline should be sent back to the trial court with instructions as to how the issue should be tried. Under no circumstances should the petitioners, Luttes et al., be permitted to relitigate the accretion issue,

neither should the case be returned to the Court of Civil Appeals. There are other reasons why the case should not be remanded to the Court of Civil Appeals. In the first place, if the Court of Civil Appeals had before it a "weight and preponderance of the evidence" point, then the opinion of the Court of Civil Appeals clearly shows that such point was adjudicated by and overruled by that court. Secondly, I contend that the Court of Civil Appeals had no such point before it on original consideration, and the question was not raised until petitioners filed a motion for rehearing in that court. I have carefully checked the six points presented by petitioners in the Court of Civil Appeals. Some of the points amount to no evidence points, and the prayer contained in petitioners-appellants' brief conforms to the points and reads as follows:

"Wherefore, appellants pray judgment of this Honorable Court reversing the judgment of the Trial Court and rendering judgment for the appellants for said tract of 3,365.52 acres."

This prayer conforms to the argument and statement contained in the briefs. Throughout the brief the statement is made —"there is no evidence" or the evidence is undisputed or "all the evidence shows * * *." Nowhere do they urge that the findings of the trial court are so against the overwhelming weight and preponderance of the evidence as to be manifestly unjust. Thus, it is seen that the rule in In Re: King's Estate, 150 Texas 662, 244 S.W. 2d 660, has no application in the instant case. I seriously doubt that the petitioners raise the question in this Court.

I find eleven points of error and the eleventh one is the only point that in any manner raises the question. That point reads:

"In failing and refusing to pass upon the sufficiency of the evidence to support findings by the trial court that the land in controversy are not fast land and that it is impossible to apportion the accretions between the mainland and the islands."

There was no similar point before the Court of Civil Appeals. I repeat that the only points were what we commonly call "no evidence" points. This being true, the Court of Civil Appeals, among other things, stated in its opinion that it was deciding the case in accordance with the rules announced in the cases of Cavanaugh v. Davis, 149 Texas 573, 235 S.W. 2d 972, 977; Woodward v. Ortiz, 150 Texas 75, 237 S.W. 2d 286.

In the instant case, the Court of Civil Appeals said: "Since this cause was tried without the aid of a jury, we must approach our task in the light of certain well established rules." Then it proceeded to follow the only rule applicable to the points before it. It said:

"First of all, judgment by the trial court will not be set aside if there is any evidence of a probative nature to support it, and a Court of Civil Appeals cannot substitute its findings of fact for those of the trial court if there is any evidence in the record to sustain the trial court's findings."

Following this rule, the court then held that the findings of the trial court were supported by probative evidence and affirmed the judgment. However, if it could possibly be said that a "preponderance of the evidence" point was before that court then the court decided that point adversely to the petitioners when it said: "Since the trial court found that appellants failed to carry their burden in this behalf, it is our view that *considering the testimony on the whole,* we should not set aside the findings of the trial court." The court made it clear, it seems to me, that it went further than required and complied with the rule in the King case, supra, wherein it was held "The evidence supporting the verdict is to be weighed along with the other evidence in the case, including that which is contrary to the verdict." It seems to me that when the court says "considering the testimony as a whole" it should be taken to mean that the court considered *all* the evidence. This should be especially so since the Court of Civil Appeals overruled petitioners' motion for rehearing. As heretofore pointed out, the petitioners for the first time urged preponderance of the evidence points in their motion for rehearing. In that motion they still prayed that the judgment of the trial court be reversed and rendered, but did not pray that the judgment be remanded. The Court of Civil Appeals followed the rule in the Cavanaugh v. Davis case, supra, wherein we said: "The rule is well settled that the judgment of a trial court will not be set aside if there is any evidence of a probative nature to support it and that a Court of Civil Appeals *cannot substitute its findings of fact* for those of the trial court if there is any evidence in the record to sustain the trial court's findings."

The petitioners rested their case almost entirely upon the testimony of Dr. Lohse, and they argued that there was no evidence of probative force to the contrary. The trial court, the

Court of Civil Appeals, and this Court have overruled such contention. This should end the litigation.

Reverting to the question of sending the case back to the trial court for a new trial on the issue as to the location of the shoreline, of course, this cannot be done unless this court has found error sufficient to reverse the judgment.

In the event the case is remanded, then I express the following views which, in my opinion, should be adopted by this Court as a guide for the trial court in determining the location of the shoreline.

We should not overrule the language in many early cases and hold that the common-law line and the civil-law line are the same. The shoreline should be determined according to the civil law. This line cannot, under any circumstances, be accurately determined by the use of the tide gauge. According to the provisions of Las Siete Partidas, the seashore is the land that is covered with water from time to time. The Spanish verb "cubrir" is used, which means "to cover." The seashore, then, is that portion that is alternately covered and uncovered by the sea. The height of the water on the tide gauge is not the same as the height of the water that rolls up or is blown up on the shore. The tide gauge might be used to establish prima facie the location of the shoreline, but it should always be held to only be prima facie evidence of the true line. Such presumptive evidence may be destroyed by the facts. In other words, the question of the location of the shoreline is one of fact and not one of law. There is nothing in the Partidas definition dealing with tide gauge. What I am contending for here does not in the least conflict with the holding by the Supreme Court of the United States in the famous case of Borax, Ltd. v. Los Angeles, 296 U.S. 10. In fact, Chief Justice Hughes carefully reviewed the civil law in the Borax case, and held that the civil-law shoreline and the common-law shoreline were not the same. See also 65 C.J.S. 194: *Gould on Waters*. The tide gauge would be wholly inaccurate to establish the true seashore line.

The Partidas definition is apropos to consider at this point:

"Every man can build a house or a hut on the seashore where he can find shelter whenever he wishes; he can also build there another edifice whatsoever for his own benefit, provided the common use [of the seashore] of the people is not hampered; and he can construct galleys and any other kind of ships and dry

nets there and make new ones if he desires to do so; and so long as he is working there or is present, no one else should molest him so that he cannot use and be benefited by all these things, and by others like them, in the manner aforesaid; and all that place is called seashore which is covered with the water of the sea when it grows more (or swells) during the entire year, whether in winter or in summer." Law IV, Title 28, Partidas III; the Civil law which is controlling in this case.

This definition is that the seashore is a place where every man may build a house or other building, build boats and dry nets. Very few men would want to build houses out in the water and none would want to stand in the water while building their boats, and most conclusive of all, none would attempt to dry his nets in water or even on the wet portion of the beach.

The Lopez footnotes or glossary are set out in Appendix No. 6 of the Professor's work at page 11a. Footnote No. 4 is the one mainly in point. Here Professor Martinez-Lopez translates from the Latin a footnote as setting the boundary line "as far as the highest of the swells (meaning the single highest swell [fluctus] boils up throughout the entire year, during the winter as well as during the strong windy storms of the summer." To back up his translation, the Professor adds this footnote at page 12a: "This passage (dealing with the single highest swell) the translator considered of such crucial importance that in order to render it with the greatest possible accuracy he availed himself of the learned counsel and advice of the eminent specialist in Roman law Dr. Clyde Pharr, distinguished Professor of the Classical Languages Department of the University of Texas. Dr. Pharr was employed by the American Bar Association and by the University of Princeton to prepare a new revised translation of the whole body of Roman law (Corpus Juris Civilis). He is probably the highest living authority in America on these matters."

Lopez makes a sensible interpretation by pointing out that the Partidas definition did not include extraordinary flows which Judge Holmes in *Humble v. Sun* says sometimes sweep as much as fifty miles inland, but he states that the seashore does extend as far as the greatest wave boils up, during a violent wind, regardless of the time of the year when the wave appears.

It seems to be unassailable that the civil law contemplated the area actually reached by the sea, though only a single swell. If the tide gauge is accepted as the absolute determinate in placing or locating the shoreline, then we are establishing a

rather artificial line. This is proved by a letter contained at pages 57, et seq. of Brief for the Petitioners, which is a reply from the Assistant Director of the U. S. Coast and Goedetic Survey, to queries by petitioners. This letter points out that "the height of water recorded by our tide gauges is the approximate still water height and is not the height of the waves that roll or are blown up on the shore." It is evident from a study of the letter that no statement is made about the vegetation line; rather, the terms used are "tidal datum planes." These planes obviously could not coincide with different heights of water due to local conditions, which would be indicated by the vegetation line. Petitioners, Luttes et al., admit this when they state that "high water at the Brazosport (Freeport) area averages at least six-tenths (.6) of a foot higher than at Galveston; and, of course, local conditions could cause a greater temporary variation on any given day."

The height of the waters differs all over the Gulf of Mexico. Their height depends on such things as prevailing winds, the types of openings in bays, etc. Heights of water may differ even on opposite shores of a bay. In other words, a strong wind will tend to drive it off of a shore on the windward side and pile it up on the opposite shore.

In addition, there is evidence that different tide gauges register differently. This is because of the variable sizes of the hole through which the water pours into the well of the gauge. If the hole is small, the gauge will be less likely to register sudden rises or drops in the height of the waters.

We then must consider that tide gauges cannot be located at every nook and cranny of the vast Texas coast, due to their great expense. To permit the surveyors to rely on mathematical computations using such sparsely located tide gauges as are available, in order to determine the shoreline at any given point, would add artificiality to artificiality. There seems to be no logical formula to replace the civil law rule of determining each case on its own facts. One widely recognized authority on the subject of seashore boundaries has the following to say:

" 'The line of residue left as a deposit by the waters of the sea is so firmly and definitely fixed by nature, acting over a long period of years, as a mark not to be ignored by a layman, a surveyor or a court. * * *' "

" 'Every person of normal intelligence who is an inhabitant

of the coast, any surveyor seeking facts will find this line of drift along the toe of slope of the small shelf or bench along the entire Texas coast except in those rare instances where we find a clay bluff extending from the upland to the waters of the sea, even here you will find the line of drift, shells, seaweed, dead fish, crabs and other marine life. This line of drift is along the bottom of the small shelf or bench seldom over a foot to a foot and half high, on top of this shelf from its edge inland is covered by upland growth, from the toe of the same seaward is 99% of the time nothing but bare sand over which the sea rises and falls with such frequency as to make the ground or beach of such saline content as to prohibit the growth of vegetation. This is the area inhabited by fiddler crabs and sea fleas and sea lice, which cannot survive in sweet water. The bench or shelf created by God Almighty, not by tide gauges, surveyors or level rods— is nature's answer to the boundary between sea and upland.' "

Thus it would seem that we do not need to feel constrained to adopt an artificial rule when there is a very workable and natural one available. If the common-law line of mean high tide, rather than the civil-law shoreline, is adopted, it will mean that on the average day, when the high tide rolls in, the entire beach area belonging to the public would be covered with water. One wishing to spend the day or the night at the beach would have to stay in the water at high tide or be a trespasser. Would it not be the better part of wisdom to set the line at the high water mark, the vegetation line, so that this result could be avoided? Both the practicalities and the law of the case forecefully indicate that the arbitrary rule based on the tide gauge is undesirable.

There is the sea and there is the seashore, both of which belong to the State. As stated in the Balli case, the seashore has always been deemed an adjunct of the sea. Clearly, a seashore as defined in the Partidas means the beach area up to the vegetation line. That is the line on the ground where the sea and its adjunct, the shore, end and the upland begins.

But, petitioners say, let the coastal counties condemn the beaches for the public's use. This plan, of course, would impose an intolerable burden upon already over-strained county budgets. Then, again, the petitioners' suggestion that the public could establish a right by prescription is, on its face, impractical.

I repeat that the tide gauge with its attendant fallibilities should not prevail over the clearly ascertainable facts in any

given case before the courts of this State. Parties should not be denied their right to have the facts of their case adjudicated on the merits.

Should the Court adopt the vegetation line, it is of course clear that the accretion question would be eliminated from the case, since all parties agree that the flats in dispute are below said line.

My conclusion is that our jurisprudence has accepted the civil-law rule for practically 100 years, and there is no logical reason to now depart from this standard. The majority opinion has been rewritten so as to modify some of its former holdings. Some of the views expressed in the latest majority opinion are now in accord with the views herein expressed. To that extent, I concur with the majority. The judgment of the Court of Civil Appeals affirming the trial court's judgment should be affirmed.

Opinion delivered December 10, 1958.

### ON SECOND MOTION FOR REHEARING

MR. JUSTICE SMITH, dissenting.

In the dissenting opinion dated December 10, 1958, the question of the shoreline was discussed. The shoreline question was discussed by me only because the majority passed upon the question. The motions for rehearing have this day been overruled. I now desire to point out more specifically and to reiterate that the entire discussion and holding relative to the shoreline by the majority is unnecessary to a decision in this case, and, therefore, is pure dicta, and has no place in the opinion or judgment to be rendered by this Court or the Court of Civil Appeals. The majority make no contention that the shoreline question is controlling. The Court of Civil Appeals has been instructed by the majority to affirm the judgment of the trial court, if it rules that the particular findings of the trial court are not so against the overwhelming weight and preponderance of the evidence as to be manifestly unjust. The affirmance would be in favor of the State. The Court of Civil Appeals cannot under any circumstances take into consideration the dicta expressed by the majority in determining the preponderance of the evidence question. Of course, I still contend that the only proper judgment was one affirming the judgment of the trial court and the Court of Civil Appeals awarding title to the 4086.61 acres to the State of Texas.

The writ of error was improvidently granted. It should have been refused, no reversible error, but, since it was granted and an opinion has been written by the majority, I deemed it necessary to discuss the shoreline question in my dissent of December 10, 1958. However, in the event of the Court of Civil Appeals, upon further consideration, should sustain petitioners' contention that the finding on the basic issue in this case is against the great weight and preponderance of the evidence and remands the case to the District Court for a new trial, it is my contention that the majority opinion does nothing more than hold that the question of determining the shoreline is one of fact, and that the location of the shoreline may be determined from the evidence to be the beach area up to the vegetation line. The majority in its opinion on motion for rehearing retreated from its original opinion wherein it held that the shoreline was to be determined by exclusive resort to tide gauges. If I understand the opinion on motion for rehearing it simply means that the tide gauge is to be only one of the methods of determining the location of the shoreline.

Opinion delivered May 6, 1959.