IN THE SUPREME 
COURT OF TEXAS
 
════════════
No. 
09-0387
════════════
 
Carol Severance, 
Petitioner,
 
v.
 
Jerry Patterson, Commissioner 
of the Texas General Land Office; Greg Abbott, attorney General for the State of 
Texas; and Kurt Sistrunk,
District Attorney for the 
County of Galveston, Texas, Respondents
 
════════════════════════════════════════════════════
Certified Question on Appeal 
from the
United States District Court 
for the Southern District of Texas
════════════════════════════════════════════════════
 
 
Argued November 19, 2009
 
 
            
Justice Medina, joined 
by Justice Lehrmann, 
dissenting. 

 
            
Texas beaches have always been open to the public.  The public has used 
Texas beaches for transportation, commerce, and recreation  continuously for nearly 200 years.[1]  The Texas shoreline is an expansive yet diminishing[2] public resource, and we have the most 
comprehensive public beach access laws in the nation.  Since its enactment 
in 1959, the Texas Open Beaches Act (“OBA”) has provided an enforcement 
mechanism for the public’s common law right to access and to use Texas 
beaches.[3]  The OBA enforces a reasoned balance 
between private property rights and the public’s right to free and unrestricted 
use of the beach.[4]  Today, the Court’s holding disturbs 
this balance and jeopardizes the public’s right to free and open 
beaches.
  
         After chronicling the history 
of Texas property law, the Court concludes that easements defined by natural 
boundaries are, by definition, dynamic.  ___ S.W.3d 
___.  Yet, in a game of semantics, the Court finds that such dynamic 
easements do not “roll.”  Id. at ___.  The Court further 
distinguishes between movements by accretion and erosion and movements by 
avulsion, finding that gradual movements shift the easement’s boundaries, but 
sudden movements do not.  The Court’s distinction protects public beach 
rights from so-called gradual events such as erosion but not from more dramatic 
events like storms, even though both events are natural risks known to the 
property owner.  Because the Court’s vague distinction between gradual and 
sudden or slight and dramatic changes to the coastline jeopardizes the public’s 
right to free and open beaches, recognized over the past 200 years, and 
threatens to embroil the state in beach-front litigation for the next 200 years, 
I respectfully dissent.
I.  Texas Coastal Property Ownership 

 
            
Property lines on the coast are defined by migratory, dynamic boundaries.  
In Luttes v. State, we determined that 
Anglo-American common law applied to land grants after 1840[5] and thus affixed the mean high tide as 
the boundary between state and private ownership of land abutting tidal 
waters.  324 S.W.2d 167 (Tex. 1958).  The 
beach is commonly known to lie between the mean low tide and vegetation 
line.  For over fifty years, the OBA has assimilated that common knowledge 
as a statutory definition as well.  All land seaward of the mean high 
tide,[6] known as the wet beach, is held by the 
state in public trust.  Luttes, 324 S.W.2d 
at 191–93; see State v. Balli, 190 S.W.2d 71, 
100 (Tex. 1945) (recognizing the “ancient maxim that seashore is common property 
and never passes to private hands”).  The land between the mean high tide 
and the vegetation line is the dry beach and may be privately owned.  Luttes, 324 S.W.2d at 
191–93.  I agree with the Court that “[w]e have never held the dry 
beach to be encompassed in the public trust.”  ___ S.W.3d 
___.  If this case were a matter of title, Luttes would provide the answer: the mean high tide 
separates public and private property ownership interests.  But this case 
is about the enforcement of a common law easement that preserves the public’s 
right to access the dry beach. 
            
The mean low tide, mean high tide, and vegetation line are transitory.[7]  Landowners may own property up to 
the mean high tide.  But the exact metes and bounds of the beachfront 
property line cannot be ascertained with any specificity at any given time other 
than by reference to the mean high tide.  Through shoreline erosion, 
hurricanes, and tropical storms, these lines are constantly moving both inland 
and seaward.  In the West Bay system, whence this litigation arose, 
forty-eight percent of the shoreline is retreating, forty-seven percent is 
stable and six percent is advancing, at an average rate of -2.9 feet per year.[8]  The beaches on west Galveston 
Island, where Severance’s property is located, have even higher retreat rates (a 
loss of over seven feet per year) because of their exposure to winds and 
waves.[9]  Natural erosion from waves and 
currents causes an overall shoreline retreat for the entire Texas coast.[10]
            
These natural laws have compelled Texas common law to recognize rolling 
easements.[11]  Easements that allow the public 
access to the beach must roll with the changing coastline in order to protect 
the public’s right of use.  The dynamic principles that govern vegetation 
and tide lines must therefore apply to determine the boundaries of pre-existing 
public beachfront easements.  See Matcha v. 
Mattox, 711 S.W.2d 95, 100 (Tex. App.—Austin 1986, writ ref’d n.r.e.) cert. denied, 
481 U.S. 1024 (1987) (“An easement fixed in place while the beach moves 
would result in the easement being either under water or left high and dry 
inland, detached from the shore.  Such an easement, meant to preserve the 
public right to use and enjoy the beach, would then cease functioning for that 
purpose”).  “The law cannot freeze such an easement at one place anymore 
than the law can freeze the beach itself.”  Id. 
 
 
II.  Texas Recognizes Rolling Easements
            
The first certified 
question asks whether Texas recognizes rolling beachfront access easements that 
move with the natural boundaries by which they are defined.  The answer is 
yes.  The rolling easement “is not a novel idea.”  Feinman, 717 S.W.2d at 
110.  Courts consistently recognize the migrating boundaries of 
easements abutting waterways to uphold their purpose.[12]  Id.  After all, “an 
easement is not so inflexible that it cannot accommodate changes in the terrain 
it covers.”  Id.  
           The law of 
easements, Texas law, and public policy support the enforcement of 
rolling easements.  Such easements follow the movement of the dry beach in 
order to maintain their purpose and are defined by such purpose rather than 
geographic location.  They are therefore affected by changes to the coast 
but never rendered ineffective by the change.  The primary objective is not 
to ensure the easement’s boundaries are fixed but rather that its purpose is 
never defeated.  
A.  Texas 
Easement Law
            
An easement is a non-possessory property interest that authorizes its holder to 
use the property of another for a particular purpose.  Marcus Cable Assocs. v. Krohn, 90 
S.W.3d 697, 700 (Tex. 2002).  “A grant or reservation of an easement 
in general terms implies a grant of unlimited reasonable use such as is 
reasonably necessary and convenient and as little burdensome as possible to the 
servient owner.” Coleman v. Forister, 514 S.W.2d 899, 903 (Tex. 1974).  
However, the burden on the servient estate is 
secondary to ensuring that the purpose of the easement is reasonably 
fulfilled.  For example, oil and gas leases convey an implied easement to 
use the surface as reasonably necessary to fulfill the purpose of the 
lease.  See Sun Oil Co. v. Whitaker, 483 S.W.2d 808, 810 (Tex. 1972) 
(recognizing that the use easement is not limited by fixed boundaries but rather 
its purpose and use).  The purpose of the easement cannot expand, but under 
certain circumstances, the geographic location of the easement may.  
Compare Marcus Cable Assocs., 90 S.W.3d at 701 (preventing easement 
holder from expanding purpose of maintaining electric transmission or 
distribution line to also include cable-television lines regardless of fact that 
lines could be run on exact same geographic location) with Godfrey v. City of 
Alton, 12 Ill. 29, (1850) (recognizing that a public easement for a public 
landing on specific waterway is necessarily “inseparable from the margin of the 
water, however that may fluctuate”).  
            
Easements may be express or implied.  Implied  
easements are defined by the circumstances that create the 
implication.  Ulbricht v. Friedman, 325 S.W.2d 669, 677 (Tex. 1959) 
(finding an implied easement to use lake water for cattle as they were located 
upland and without any water source).  Express easements, however, must 
comply with the Statute of Frauds, which requires a description of the 
easement’s location.  Pick v. Bartel, 
659 S.W.2d 636, 637 (Tex. 1983).  Under 
certain circumstances, even express easement boundaries may be altered to 
maintain the purpose of the easement.  See Kothmann v. Rothwell, 280 
S.W.3d 877, 880 (Tex. App.—Amarillo 2009, no pet.) (recognizing movement of 
drainage tracts to maintain easement’s purpose despite the expansion of original 
easement location); see also Restatement (Third) of Property (Servitudes) 
§ 4.1 (2000) (providing that an easement “should be interpreted to give 
effect to the intention of the parties ascertained from the language used in the 
instrument, or the circumstances surrounding the creation of the servitude, and 
to carry out the purpose for which it was created”).
            
Rolling beachfront access easements are implied by prescription or continuous 
use of the dry beach and are defined by their purpose and their dynamic, 
non-static natural boundaries.  To apply static real property concepts to 
beachfront easements is to presume their destruction.  Hurricanes and 
tropical storms frequently batter Texas’s coast.  Avulsive events are not uncommon.  The Court’s failure 
to recognize the rolling easement places a costly and unnecessary burden on the 
state if it is to preserve our heritage of open beaches.  
            
The Court’s conclusion that beachfront easements are dynamic 
but do not roll defies not only existing law but logic as well.  The 
definition of “roll” is “to impel forward by causing to turn over and over on a 
surface.” Webster’s Ninth New Collegiate Dictionary (Merriam-Webster Inc. 
1983).  “Dynamic” means “of or relating to physical force or energy” and 
“marked by continuous activity or change.”  Id.  Both terms 
express movement, but neither term is limited by speed or degree of movement. 

           
The Court also illogically distinguishes between shoreline movements by 
accretion and avulsion.  On the one hand, the Court correctly declines to 
apply the avulsion doctrine to the mean high tide.  ___ 
S.W.3d ___.  This means a property owner loses title to land if, 
after a hurricane or tropical storm, such land falls seaward of the mean high 
tide.  On the other hand, this same hurricane, under the Court’s analysis, 
requires the state to compensate a property owner for the land that now falls 
seaward of the vegetation line unless it was already a part of the public 
beachfront easement.  Under the Court’s analysis, the property line may be 
dynamic but beachfront easements must always remain temporary; the public’s 
right to the beach can never be established and will never be secure.[13]  
            
The Court’s distinctions nullify the purpose of rolling easements.  I 
submit (in accord with several other Texas appellate courts that have addressed 
the issue of rolling easements) that natural movements of the mean high tide and 
vegetation line, sudden or gradual, re-establish the dynamic boundaries 
separating public and private ownership of the beach, as well as a pre-existing 
public beachfront access easement.  So long as an easement was established 
over the dry beach before the avulsive event, it must 
remain over the new dry beach without the burden of having to re-establish a 
previously existing easement whose boundaries have naturally shifted.
            
Finally, I submit that once an easement is established, it attaches to the 
entire tract.  Drye v. Eagle Rock Ranch, 
Inc., 364 S.W.2d 196, 207 (Tex. 1963).  Regardless of how many 
times the original tract is subdivided, the easement remains.  Id. (enforcing pre-existing implied 
easement across subsequently divided tracts to fulfill its 
purpose).  
            
Private ownership of Galveston Island originated in two land grants issued by 
the Republic of Texas.  First, it arose from the Menard Grant in 
1838, which covers the east end of the Island.  See 
Seaway Co., 375 S.W.2d at 928; City of Galveston v. Menard, 23 
Tex. 349, 403–04 (1859).  Second, it issued from the Jones and Hall 
Grant in 1840, which encompasses 18,215 acres, and includes the West Beach, 
where Severance’s property is located.  See Seaway Co., 375 S.W.2d 
at 928 (covering “all of Galveston Island except the land covered by the Menard 
Grant covering the east portion of the Island”).
            
The Court today reasons that because no express easement was made in 
these original land grants, no public easement can exist over the dry 
beach.  ___ S.W.3d ___.  The Court, however, 
ignores the implied easement arising from the public’s continuous use of the 
beach for nearly 200 years.  The state may have relinquished title in these 
original grants, but it did not relinquish the public’s right to access, use, 
and enjoy the beach.  See Ratliff, 13 Hous. L. Rev. at 994 (recognizing that 
until Luttes the public, as well as private 
landowners, believed beaches to be public domain).
            
By implied prescription, implied dedication, or customary and continuous use, 
overwhelming evidence exists that Texans have been using the beach for nearly 
200 years.  See Seaway Co., 375 S.W.2d at 936 (finding that “owners, 
beginning with the original ones, have thrown open the beach to public use and 
it has remained open”); see also supra n. 1.  This evidence 
establishes that public beachfront access easements have been implied across 
this Texas coastline since statehood.  As long as a dry 
beach exists, so too must beachfront access easements.  Any other 
result deprives the public of its pre-existing, dominant right to unrestricted 
use and enjoyment of the public beach.  
B.  Texas Case 
Law
            
The Court states it is “unaware of any case law permitting such an expansive 
interpretation of easement rights that would so unduly burden the underlying 
servient estate.”  ___ S.W.3d 
___ (requiring easements to be re-established over new dry beach after each 
avulsive event).  I submit that Texas case 
law not only recognizes the existence of public beachfront access easements but 
further that they “roll” with the movements of their dynamic, natural 
boundaries.[14]
            
Before Luttes, the public assumed it had 
unrestricted access to use and enjoy the beach.[15]  After Luttes, in response to public concern over its right 
to access Texas beaches, the Texas Legislature passed the OBA to ensure that 
Texas beaches remained open for public use.  Challenged five years later, 
the Houston Court of Civil Appeals found that a public easement existed on the 
West Beach of Galveston Island, forcing landowners to remove barriers and 
structures that prevented the public’s access to and use of the public 
beach.  Seaway Co. v. Attorney General, 375 S.W.2d at 940; see also Moody v. White, 593 S.W.2d 372, 
376-79 (finding public easement over dry beach on Mustang Island and requiring 
removal of structure preventing public access). 
   
            
In the years following the passage of the OBA, the shoreline naturally and 
predictably moved both gradually and suddenly.  Texas courts have 
repeatedly held that once an easement is established, it expands or contracts 
(“rolls”), despite the sudden shift of the vegetation line.  See Feinman, 717 S.W.2d at 109–10 (after Hurricane Alicia); 
Arrington v. Tex. Gen. Land Office, 38 S.W.3d at 765 (after Tropical 
Storm Frances); Brannan v. State, No. 01-08-00179-CV, 2010 WL 375921, 
*2 (Tex. App.—Houston [1st Dist.] Feb. 4, 2010, pet. 
filed) (after unusually high tide or “bull 
tide”); Matcha, 711 S.W.2d at 100 (after 
hurricane of 1983); Arrington v. Mattox, 767 S.W.2d at 958 (after 
Hurricane Alicia).  In short, Texas law has adopted “the rolling easement 
concept.”  Feinman, 717 
S.W.2d at 110–11.  The Court’s refusal to follow existing Texas law 
means that every hurricane season will bring new burdens not only on the 
public’s ability to access Texas’s beaches but on the public treasury as 
well.
C.  Texas 
Public Policy
            
The OBA codifies the public’s pre-existing right of open access to Texas 
beaches:     
It is declared and affirmed to be the public policy of 
this state that the public, individually and collectively, shall have the free 
and unrestricted right of ingress and egress to and from the state-owned beaches 
bordering on the seaward shore of the Gulf of Mexico, or if the public has 
acquired a right of use or easement to or over an area by prescription, 
dedication, or has retained a right by virtue of continuous right in the public, 
the public shall have the free and unrestricted right of ingress and egress to 
the larger area extending from the line of mean low tide to the line of 
vegetation bordering on the Gulf of Mexico.
  
Tex. Nat. 
Res. Code § 61.011(a) 
(emphasis added).  Migratory boundaries define rolling easements, rather 
than fixed points.  The line of vegetation is “the extreme seaward boundary 
of natural vegetation which spreads continuously inland.”  Tex. Nat. Res. Code § 61.001(5) 
(emphasis added).  Public beach means 
any beach area, whether publicly or privately owned, 
extending inland from the line of mean low tide to the line of vegetation 
bordering on the Gulf of Mexico to which the public has acquired the right of 
use or easement to or over the area by prescription, dedication, presumption, or 
has retained by virtue of continuous right in the public since time immemorial, 
as recognized in law and custom.  
 
Tex. Nat. Res. Code § 
61.001(8).  The OBA recognizes the dynamic 
nature of beach boundaries by defining the public beach by reference to the 
vegetation line and tide lines, which shift with the movements of the ocean, 
whether those movements are gradual from erosion or dramatic from storm 
events.  Requiring that existing easements be re-established after every 
hurricane season defeats the purpose of the OBA: to maintain public beach 
access.  
 i.  Disclosure of Risk 
Requirement
            
For almost twenty-five years, the state has taken the further step of informing 
beachfront property purchasers of the rolling nature of the easement burdening 
their property.  Amendments to the OBA in 1985 make “pellucid that once an 
easement on the dry beach is established, its landward boundary may therefore 
‘roll,’ including over private property”.  Severance v. 
Patterson, 566 F.3d 490, 506 (5th Cir. 2009) (Wiener, J., dissenting) 
(emphasis in original); see also Act of May 24, 1985, 69th Leg., R.S., ch. 350, § 1, 1985 Tex. Gen. Laws 1419 (codified as Tex. Nat. Res. Code § 61.025).  Sellers of 
property on or near the coastline are required to include in the sales contract 
a “Disclosure Notice Concerning Legal and Economic Risks of Purchasing Coastal 
Real Property Near a Beach.”  Tex. Nat. Res. Code § 61.025(a).  The notice 
specifically warns that 
If you own a structure located on coastal real property 
near a gulf coast beach, it may come to be located on the public beach 
because of coastal erosion and storm events. ... Owners of structures 
erected seaward of the vegetation line (or other applicable easement boundary) 
or that become seaward of the vegetation line as a result of natural 
processes such as shoreline erosion are subject to a lawsuit by the State of 
Texas to remove the structures.  
 
Tex. Nat. 
Res. Code § 61.025 (a) 
(emphasis added).  The language of the Act itself clearly identifies the 
line of vegetation as an easement boundary and clearly recognizes the transient 
nature of these boundary lines.  The vegetation line, “given the vagaries 
of nature, will always be in a state of intermittent flux[,]” and consequently, “[s]hifts in the vegetation line do not create new easements; 
rather they expand (or in the case of seaward shifts, reduce) the size and reach 
of one dynamic easement.”  Severance v. Patterson, 
566 F.3d 490, 506 (5th Cir. 2009) (Wiener, J., dissenting).  
Severance purchased her properties with contracts that notified her of these 
risks and nature of the rolling easement.    
ii.  Constitutional Amendment Adopting the Open Beaches 
Act
            
In November 2009, Texans adopted a constitutional amendment that mirrors the 
policy and language of the OBA.  The amendment adopts the OBA’s definition 
of “public beach” and reiterates that the public’s easement is established under 
Texas common law.  Tex. Const. art. 
I, § 33(a).  It further acknowledges the permanent 
nature of the easement.  Id. at § 
33(b).  To be consistent with the Texas Constitution, these 
easements must roll with the natural changes of the beach.  The Court’s 
failure to recognize the rolling nature of these easements is thus not only 
contrary to common law and the public policy of the state but also the will of 
the people expressed in our constitution. 
iii.  Presumption of Public Easement Over Dry 
Beach
            
Finally, in an OBA enforcement action, there is a presumption that the public 
has acquired an easement over the dry beach, and a landowner like Severance may 
present evidence to rebut the presumption.  See Tex. Nat. Res. Code § 61.020.  The “title of 
the littoral owner does not include the right to prevent the public from using 
the area for ingress and egress to the sea[,]” and 
“there is imposed on the area [from mean low tide to the line of vegetation] a 
common law right or easement in favor of the public for ingress and egress to 
the sea.”  Id.  Once a public beach easement is established, it 
is implied that the easement moves up or back to each new vegetation line, and 
the state is not required to repeatedly re-establish that an easement exists up 
to that new vegetation line.  See Arrington v. Tex. Gen. Land 
Office, 38 S.W.3d at 766. 
III.  Rolling Easements Are Creatures of Texas Common 
Law
            
The answer to the second certified question is that the common law rather than 
the OBA is the source of public beachfront access easements.  The OBA, 
however, is consistent with the common law of rolling easements and faithfully 
articulates the longstanding policy of the state.  The OBA is not a 
rights-creating document but a mechanism for enforcing property rights that the 
state has previously and independently obtained.  See Arrington v. 
Mattox, 767 S.W.2d at 958.  Such easements are 
established by prescription, dedication, or customary and continuous use.  
Guided by the common law, “[t]he OBA safeguards the public’s common law easement[,]”  protecting the public’s access to public 
beaches.  Mikeska v. City of 
Galveston, 451 F.3d 376, 378 (5th Cir. 2006) (citing Tex. Nat. Res. Code § 61.001(8)).
IV.  No Compensation Owed 
to Beachfront Property Owners Whose Property Is Encumbered by a Rolling 
Easement
 
            
The third certified 
question asks whether compensation is owed to landowners whose property becomes 
subject to a public beachfront access easement after it rolls with natural 
shifts in the shoreline.  When an act of nature destroys a piece of coastal 
property, no compensation is owed because there is no taking by the 
government.  Likewise, when an act of nature changes the boundaries of the 
beach, no compensation is owed when the government seeks to protect the already 
existent public right of access to the beach.  The government is merely 
enforcing an easement whose boundaries have shifted.  The enforcement of 
rolling easements does not constitute a physical taking nor does it constitute a 
regulatory taking.  Pre-existing rolling easements affect a property right 
that the landowner never owned, namely, excluding the public from the 
beach.  Because no property is taken, no compensation is owed.
A.  No 
Physical Taking
            
The Texas 
Constitution guarantees that “[n]o person’s property shall be taken, damaged, or 
destroyed for or applied to public use without adequate compensation being made, 
unless by the consent of such person.”  Tex. Const. art. I § 
17.  Texas landowners may assert an inverse condemnation claim “when 
the government physically appropriates or invades the property, or when it 
unreasonably interferes with the landowner’s right to use and enjoy the 
property.”  Westgate Ltd. v. State, 843 S.W.2d 
448, 452 (Tex. 1992).  By enforcing a pre-existing rolling easement, 
the state is not physically taking private property.  
            
For property purchased after October 1986, landowners were expressly warned that 
a pre-existing public easement of the dry beach restricts the landowner’s right 
to develop, maintain, or repair structures that would prevent the public from 
using and accessing the public beach.  See Tex. Nat. Res. Code § 61.025.  The right to 
exclude the public from the dry beach was never in the landowner’s bundle of 
sticks when she purchased the property.[16]  With such 
express notice, the state’s enforcement of the public easement cannot be said to 
diminish the landowner’s reasonable investment-backed expectations.  See 
Penn. Cent. Transp. Co. v. City of New York, 438 U.S. 104, 130–31 (1978). 
 The state owes no compensation for a property right that the landowner 
does not actually possess.  
            
For property purchased before 1986, enforcement of a pre-existing rolling 
easement also does not constitute a physical taking.  First, rolling 
easements are rooted in the common law as a single easement with dynamic 
boundaries.  The public beach has been “historically dedicated to the 
public use.”  Brannan, 2010 WL 375921, at 
*21.  It is not state action that subjects beachfront property to 
this rolling easement but rather a force majeure.  Id.  
The state merely enforces what has long been established in the common 
law.  Almost every case addressing this issue agrees there is no taking and 
that the landowner should bear the risks assumed by purchasing property near the 
beach.  “There is nothing in the [OBA] which seeks to take rights from an 
owner of land . . . . [I]t merely furnishes a means by which the members of the 
public may enforce such collective rights as they may have legally acquired by 
reason of dedication, prescription or which may have been retained by continuous 
right.”  Seaway Co., 375 S.W.2d at 930; see Arrington v. 
Mattox, 767 S.W.2d at 958; Moody, 593 S.W.2d at 379; Brannan, 
2010 WL 375921, at *19-20. 
B.  No 
Regulatory Taking
            
The enforcement of rolling easements does not constitute a regulatory 
taking.  “When the owner of real property has been called upon to sacrifice 
all economically beneficial use in the name of the common good, that is, to 
leave his property economically idle, he has suffered a taking.  
Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1019 (1994) 
(establishing the total takings test).[17]  But there are two 
exceptions.  First, if the regulation restricts a use the owner does not 
have in his title, no taking has occurred.  Id. at 1027.  Second, if state 
common law nuisance and property principles prohibit the desired use of the 
land, no taking has occurred.  Id. at 1029.
            
The first exception certainly applies to property purchased after 1986.  As 
explained above, the landowner cannot receive compensation for a property right 
that she never owned.  Beachfront property purchasers whose sales contracts 
contained such a deed restriction never owned the right to exclude the public 
from using and enjoying the dry beach. 
            
The second exception involves the state’s common law nuisance laws and other 
background property principles that prohibit or restrict the landowner’s 
specific use of property.  As explained above, the rolling easement is 
rooted in background principles of Texas common law and is supported by the OBA 
and the Texas Constitution.  Due to natural processes, as land moves 
seaward of the vegetation line, that strip of land becomes subject to the 
pre-existing public easement established by either prescription, dedication, or 
continuous and customary use.  This strip of land is the servient estate, encumbered by the dominant estate, the 
rolling easement, to reasonably fulfill its stated purpose.  Drye v. 
Eagle Rock Ranch, Inc., 364 S.W.2d 196, 207 (Tex. 1963).  The 
common law has always restricted a landowner’s use of the dry beach.  
Arrington v. Mattox, 767 S.W.2d at 958 (citing Texas cases that 
found no taking and recognizing “fundamental distinction between a governmental 
taking of an easement through an act of sovereignty and judicial recognition of 
a common law easement acquired through historical public use”); see 
Lucas, 505 U.S. at 1028–29 (finding enforcement of existing easement 
not a taking). 
C.  Texas 
Nuisance Law
            
Texas nuisance laws permit the enforcement of rolling easements without 
requiring compensation.  This area of the law imposes a general limitation 
on landowners.  Property owners may not use their property in a way that 
unreasonably interferes with the property rights of others.  See Schneider Nat. Carriers, Inc. v. Bates, 147 S.W.3d 264, 
269 (Tex. 2004).  An action that does not begin as a nuisance may 
nevertheless become a nuisance due to changing circumstances.  See Atlas 
Chem. Indus., Inc. v. Anderson, 524 S.W.2d 681, 685–86 (Tex. 1975) (finding 
that heavy rains causing previously discharged pollutants from upstream 
manufacturing plant to spread more broadly across downstream land to be a 
nuisance).  Movements of the coast change circumstances and thus affect 
property rights of both private beachfront owners and the public.  As a 
result, a beach house that moves seaward of the vegetation line because of 
natural changes to the coast becomes a nuisance, restricting the public’s 
ability to use and enjoy the beach.   
            
 In this unique area of property law, rolling beachfront easements are 
unlike any other type of easement abutting a waterway.  They are not only 
subject to the ebb and flow of the tide, but also the ocean’s surging 
waves.  The ocean is unlike any other body of water.[18]  The 
primary movement of the coastline is through hurricanes and tropical 
storms.[19]  Requiring the state to 
re-establish public beach easements after storms places an unreasonable burden 
on the state, a burden that was actually assumed by the landowner who purchased 
property near the beach.
V.  
Conclusion
            
The Texas coastline is constantly changing and the risks of purchasing property 
abutting the ocean are well known.  The OBA further mandates the disclosure 
of these risks in coastal purchase contracts.  Insurance is available for 
some of these risks.[20]  It is unreasonable, however, to 
require the state and its taxpayers to shoulder the burden of these risks.  
In my view, coastal property is encumbered by a pre-existing rolling easement 
rooted in the common law.  The state is not responsible for the ocean’s 
movement and therefore owes no compensation when enforcing this existing 
easement.  Because the Court requires the state to re-establish its 
easement after avulsive events and to pay landowners 
for risks they have voluntarily assumed, I must dissent.  I would instead 
follow the constitution and the long-standing public policy of this state and 
hold that the beaches of Texas are, and forever will be, open to the 
public.    
 
 
 
 
 
 
                                                                                          
______________________________
                                                                                          
David M. Medina
                                                                                          
Justice
 
 
 
Opinion Delivered:  November 5, 2010







[1] 
Historical records indicate that a ferry from Galveston Island at San 
Luis Pass was established in 1836.  Seaway Co. v. 
Attorney General, 375 S.W.2d 923, 931 (Tex. Civ. App.—Houston 1964, writ 
ref’d n.r.e.).  
To travel between the City of Galveston Island and the ferry, the public 
traveled by beach route.  Id.  There is evidence of an 
established stage coach route traveling across the beach, and on May 23, 1838, 
the Republic of Texas authorized a mail route to run across the beach, which ran 
every two weeks.  Id.  Until Termini Road was built in 1956, 
“the only way to travel, except by private road inland within fenced land, was 
by way of the beach.”  Id. at 932.  
Testimony from earlier cases indicates that both locals and visitors to 
Galveston Island used the entire beach, “from the water line to the line of 
vegetation[,]” for driving, camping, fishing, and 
swimming.  Id. (testimony of lifetime resident 
born in 1879).  Cars parked between the dunes for camping. Id. at 933.  Finally, there is no evidence that 
fences were ever erected across any part of the beach, only evidence that they 
were landward of the vegetation line to prevent cattle from going onto the 
beach.  Id.  (testimony of lifetime 
resident since 1875 reasoning that there were no fences because “[n]o one would 
dream any such thing as to block the driveway, . . . and the driveway was in 
use, I am satisfied, at least more than a hundred eyears 
ago”).  Id.    

[2] Not 
only is Texas’s coastline expansive, we also have the highest erosion rate in 
the nation, affecting “five to six feet of sand annually.”  Michael Hofrichter, Texas’s Open 
Beaches Act: Proposed Reforms Due to Coastal Erosion, 4 Envt’l & Energy L. & Pol’y J. 
147, 148 (2009).  This erosion rate causes coastal property 
lines to change annually.

[3] It is 
important to note that the OBA only applies to public beaches that border the 
Gulf of Mexico and are accessible by public road or ferry.  Tex. Nat. Res. Code §§ 61.013(c), 
61.021.

[4] 
See Tex. Nat. Res. Code § 61.0184 
(providing procedural safeguards for property subject to OBA enforcement 
actions).  It should be noted that while the General 
Land Office contacted Severance to tell her that it might file an 
enforcement action to remove her encroachment on the public beach, the Office 
had not yet initiated such an action at the time of the litigation that gave 
rise to these certified questions.  Justice Wiener’s dissent in Severance’s 
federal action is particularly worth noting.  He maintains that this action 
“has the unintentional effect of enlisting the federal courts and, via 
certification, the Supreme Court of Texas, as unwitting foot-soldiers in this 
thinly veiled Libertarian crusade” whose quest ends with the evisceration of the 
Open Beaches Act.  Severance v. Patterson, 566 
F.3d 490, 504 (5th Cir. 2009) (Wiener, J., dissenting).  He argues 
further that beyond her claim not being ripe, Severance does not have standing 
because she attempts “to seek a benefit based on prior state action to which she 
has not only acceded and thereby forfeited or waived any related claim, but for 
which she has presumably been remunerated through an intrinsic diminution in the 
purchase price that she paid when she bought the already burdened beachfront 
land.”  Id. at 505.

[5] Texas 
adopted the common law in 1840, which established the mean high tide as the 
boundary dividing the state-owned seashore from private property.  Luttes, 324 S.W.2d at 
169.  For land grants or patents that became effective before 1840, 
Mexican/Spanish civil law applies, which recognized this tidal boundary to be 
the mean higher high tide.  Id.  Because the mean high tide is 
measured with tide gauges and calculates both daily high tides, it provides a 
more definitive boundary line than the mean higher high tide, which only 
considers the higher of the two daily tides.  Id. at 187 
(recognizing the difficulty in proving “on such and such an occasion in such and 
such a year or years one or more ‘highest waves’ actually reached this or that 
irregular line on the ground”).    

[6] “[T]he 
average of highest daily water computed over or corrected to the regular tidal 
cycle of 18.6 years.”  Luttes 324 S.W.2d at 
187.

[7] The 
mean low tide and high tide are averages assessed over a period of years.  
Their “actual determination at a given point on the coastline requires 
scientific measuring equipment and complex calculations extending over a lengthy 
period.  Thus, as a practical matter, such physical determination of the 
landowner’s actual boundary is not normally feasible.”  Richard Elliot, 
The Texas Open Beaches Act: Public Rights to 
Beach Access, 28 Baylor L. 
Rev. 383, 385 (1976).  “The line of vegetation, on the other hand, 
is readily determinable with the naked eye at most points along the Gulf 
beaches.” Id.  However, all three lines are subject to the daily 
movements of ocean, which shift these lines both gradually and suddenly. 


[8] Gibeaut, J. C., Waldinger, Rachel, 
Hepner, Tiffany, Tremblay, T. A., and White, W. A., 
2003, Changes in bay shoreline position, West Bay system, Texas: The University 
of Texas at Austin, Bureau of Economic Geology, report of the Texas Coastal 
Coordination Council pursuant to National Oceanic and Atmospheric Administration 
Award No. NA07OZ0134, under GLO contract no. 02-225R, 27 p. 14.

[9] Id.

[10] Id.

[11] 
Beginning with the recognition that property bounded by navigable waters 
is subject to the movements of the shoreline, Texas law has accepted the premise 
that rolling  easements are based upon.  See Luttes 324 S.W.2d at 196; see also Coastal 
Indus. Water Auth. v. York, 532 S.W.2d 949, 952 (Tex. 1976).  The Open 
Beaches Act codified the existing public policy that beaches on the Gulf should 
be free and unrestricted for the public’s use and enjoyment.  See  Tex. Nat. Res. Code §§ 61.011(a).  Finally, 
case law dealing specifically with the enforcement of a public beachfront easement, explicitly recognizes its rolling nature.  
Feinman v. State, 717 S.W.2d 106, 111 
(Tex. App.—Houston [1st Dist.] 1986, writ ref’d n.r.e.); Matcha v. 
Mattox, 711 S.W.2d at 99; Arrington v. Tex. Gen. Land Office, 38 
S.W.3d 764, 766 (Tex. App.—Houston [14th Dist.] 2001, no pet.); Arrington v. 
Mattox, 767 S.W.2d 957, 958 (Tex. App.—Austin 1989, writ denied), cert. 
denied, 493 U.S. 1073 (1990).

[12] This 
concept has long been recognized by courts across numerous jurisdictions.  
See Barney v. City of Keokuk, 94 U.S. (4 Otto) 324, 339–40 (1876) 
(finding no taking and public use easement boundaries moved after city filled in 
and expanded street that wharfed out to banks of 
Mississippi River for public use); Luttes, 
324 S.W.2d at 167; Cnty. of Hawaii v. 
Sotomura, 517 P.2d 57, 62 (Haw. 1973) (defining 
seaward property boundary to fall on the “upper reaches of the wash of the 
waves”); Horgan v. Town Council of 
Jamestown, 80 A. 271, 276 (R.I. 1911) (defining boundaries of public highway 
abutting waterway to be flexible); City of Chi. v. Ward, 48 N.E.927 (Ill. 
1897) (upholding a statute mandating that lands shall be held for the use and 
purposes expressed or intended); Godfrey v. City of Alton, 12 Ill. 29, 35 
(1850) (finding easement by dedication for public landing must attach to the 
waterway, “however that may fluctuate,” otherwise “its enjoyment would be 
precarious, and often destroyed”); Mercer v. Denne, [1905] 2 ch. 538 (Eng.) 
(recognizing a public easement by custom for fishermen to dry nets on the new 
portion of the beach that had been added to the old beach overtime); 
Louisiana v. Mississippi et al., 516 U.S. 22, 25 (1995) (applying rule 
that boundaries between states along a river may naturally shift in accordance 
with changes in the river channel); Georgia v. South Carolina, 497 U.S. 
376, 403-04 (1990) (same); Nebraska v. Iowa, 143 U.S. 359, 360 (1892) 
(same).  

[13] The 
Court treats the public’s easement as “fixed and definite,” which creates “a 
legal fiction that has no factual basis.”  Mike Ratliff, Public Access 
to Receding Beaches, 13 Hous. L. 
Rev. 984, 1014 (1976).  Only a “rolling easement will realistically 
and accurately depict the actual occurrences on the 
beach.” Id.    

[14] See 
Feinman, 717 S.W.2d at 111 (finding that rolling 
easement shifted after Hurricane Alicia moved the vegetation line landward 
causing homes to be seaward of vegetation line and subject to removal under 
OBA); Matcha, 711 S.W.2d at 98–100  
(finding public easement shifts with natural 
movements of the beach); Arrington v. Tex. Gen. Land Office, 38 
S.W.3d at 766 (affirming summary judgment for Land Office because once public 
easement is established “it is implied that the easement moves up or back to 
each new vegetation line”); Arrington v. 
Mattox, 767 S.W.2d at 958 (affirming that the “easement migrates and 
moves . . . with the natural movements of the natural line of vegetation and the 
line of mean low tide”); Moody, 593 
S.W.2d at 379 (recognizing that the boundary lines shift just like navigable 
rivers but can “be determined at any given point of time”).  See 
also Mikeska v. City of Galveston, 451 F.3d 376, 
378 (5th Cir. 2006) (recognizing public beach easement’s “natural demarcation 
lines are not static” but rather “change with their physical counterparts”); 
Hirtz v. Texas, 974 F.2d 663, 664 (5th 
Cir. 1992) (recognizing location of linepublic 
beach easement “shifts as the vegetation line shifts”).

[15] 
 Ratliff, supra n. 13 at 994.

[16] 
Severance 
purchased her property in 2005, and thus her land sales contract contained this 
express deed restriction.  Severance was also put on notice before the 
purchase on two separate occasions.  In 1999, the General Land Office 
released a list of homes, including Severance’s, that were located seaward of 
the vegetation line following Tropical Storm Frances.  In 2004, the 
property was again listed as being on the public beach but subject to a two-year 
moratorium order.   

[17] After 
the Lucas decision, which found a taking, and Hurricane Hugo, the South 
Carolina Legislature amended their Beach Management Act to incorporate a rolling 
easement on any lot that moved seaward of the setback line, specifically to 
avoid takings claims.  The easement permits some structures but maintains 
the right to implement some erosion control methods.  National Oceanic and Atmospheric Administration, Erosion Control 
Easements, 
http://coastalmanagement.noaa.gov/initiatives/shoreline_ppr_easements.html. 
(last visited Nov. 3, 2010).  

[18] 
 The Court correctly declines to apply the traditional avulsion rule 
to the mean high tide boundary established in Luttes.  I would also extend this to the 
vegetation line.  The reason avulsion does not change title on rivers does 
not extend to coastline.  Generally, avulsive 
events create an entirely new river bed, and “just as a stone pillar constitutes 
a boundary, not because it is a stone, but because of the place in which it 
stands, so a river is made the limit of nations [or states], not because it is 
running water bearing a certain geographical name, but because it is water 
flowing in a given channel, and within given banks, which are the real 
international boundary.”  Nebraska v. Iowa, 143 
U.S. 359, 362 (1892).  However, the running water at issue is the 
Gulf of Mexico, and it does not flow in a given channel between banks but 
rather constantly washes against the beaches.  Here, the “stone pillar” is 
the Gulf of Mexico, and it stands as the boundary, not because of its specific, 
fixed location, but rather because it is the Gulf.  Further, avulsive events on rivers merely 
cuts a new river bed, separating identifiable land from its original 
tract.  Here, when an avulsive event occurs on 
the beach, there is no identifiable land.  Rather, the previous beach 
becomes entirely submerged under the Gulf, and land previously above the 
vegetation line is now seaward of it. 

[19] Since 
1851, Galveston Island has endured more than fifty tropical storms and at least 
twenty-three hurricanes.  The worst hurricane of the nineteenth century, 
however, was on October 6, 1837, leaving a two thousand mile destruction 
path.  The Hurricane of 1900, “The Great Storm,” still holds title as the 
deadliest natural disaster to strike the United States.  It claimed the 
lives of at least eight thousand and left thirty thousand homeless.  In 
1983, Hurricane Alicia eroded fifty to two hundred feet of Galveston’s 
coastline. 

[20] The 
National Flood Insurance Program, and the Texas counterpart, the Texas Windstorm 
Insurance Association, helps shield beachfront property 
owners from the risks of a naturally changing coastline.  Hofrichter, M., 
Texas’s Open Beaches Act: Proposed Reforms Due to Coastal Erosion, 4 Envt’l & Energy L. & Pol’y J. 
147, 151 (2009).  Also, the U.S. Tax Code provides for 
certain casualty loss deductions for buildings damages from storms along the 
coast.  Id. at 150 (citing I.R.C. § 165).